## PEOPLE v. DE GARMO.

(Supreme Court, Appellate Division, Fourth Department.   May 20, 1902.)

1. MANSLAUGHTER—EVIDENCE—SUFFICIENCY.

On a prosecution for manslaughter, evidence *held* sufficient to show that death was caused by injuries inflicted by accused. and not by an accidental fall.

2. SAME—DEGREES OF CRIME CHARGED—CONVICTION OF INFERIOR DEGREE—EVI-DENCE.

Where, on a prosecution for manslaughter, the only incriminating evidence tended to show that accused struck deceased several times with an iron poker with sufficient violence to fell her to the floor, causing her death, it was not error to instruct that, if defendant was not guilty of manslaughter in the first degree, he was not guilty in any degree.

3. SAME—CONVICTION OF ASSAULT—EVIDENCE.

Code Cr. Proc. § 444, provides that, on an indictment for a crime consisting of different degrees, the jury may find defendant guilty of a degree inferior to that charged.   Section 445 provides that a defendant may be found guilty of any crime necessarily included in the offense charged; and the latter section, as amended by Laws 1900, c. 625, provides that on a prosecution for murder or manslaughter, if the act complained of be not proven to be the cause of death, defendant may be convicted of assault in any degree constituted by the act complained of, and warranted by the evidence. *Held*, that where, on a prosecution for manslaughter, the only incriminating evidence showed that defendant struck deceased several times with an iron poker, causing her death,—an assault not being a crime within the range of homicide, and hence not within section 444, and the act complained of not being necessarily included in the crime charged, and hence not within section 445, and the act being proven to be the cause of death,—no conviction for assault could be had.

Appeal from special term, Livingston county.

William M. De Garmo was convicted of manslaughter in the first degree, and he appeals.   Affirmed.

Argued before ADAMS, P. J., and McLENNAN, SPRING, WIL-LIAMS, HISCOCK, and DAVY, JJ.

George D. Forsyth, for appellant.

William Carter, for the People.

SPRING, J.   The accusation against the defendant is that on the afternoon of the 25th of October, 1900, he struck Marie Lennon, a little girl about five years of age, several times with an iron poker, knocking her down, and then stamped upon her, inflicting injuries which resulted in her death during the following night.   The defendant's father owned a cottage for summer use on the west shore of Conesus Lake, in the county of Livingston.   The girl Marie Lennon and her brother Frankie were brought to the cottage in the month of June, 1900.   The defendant was then staying in the cottage, and a Mr. and Mrs. Paul were with him, and they remained until the last of August, after which the defendant and the children were there together until October 25th.   The defendant spent his time mainly in fishing and hunting, and got the meals and did the work in the house-hold.   When the children were at the cottage, their mother went from Rochester to see them about every week, and the defendant's father was also at the cottage frequently.   On the 25th of October the de-

fendant was along the shore of the lake, hunting, and returned to the cottage in the middle of the afternoon. The direct evidence of the prosecution as to what occurred at the time of the alleged commission of the crime depends upon the testimony of the little boy, Frankie Lennon, who was then nearly eight years of age. This boy during the early part of the direct examination answered each question with reference to the transaction, with, "I don't remember," but in response to the leading questions, applied with some persistence, testified that the defendant told the little girl not to get a drink; that she disobeyed him, and thereupon the defendant struck her several times on her head and body with an iron poker about 18 inches long and one-fourth of an inch in diameter, felling her to the floor and rendering her unconscious. The boy, on his redirect examination, added that the defendant stamped upon Marie while she was lying on her back; that afterward the defendant picked her up, carried her out of the house, gave her some whisky and water, removed her waist and tie, laying them on the grindstone, and then took her upstairs to her room. After the death of his sister, Frankie told those who asked him concerning the cause of her death that she fell from a boat near the house and was injured. In explanation of this contradiction, he testified that the defendant told him to say she fell from the boat. His answers upon the cross-examination were largely confined to saying that he did not remember, although the counsel for the defendant somewhat skillfully avoided making any close inquiries concerning the infliction of the injuries upon the little girl by the defendant. The defendant, who was sworn in his own behalf, denied pointedly that he struck the little girl at all. He testified that upon his return from hunting he called for Frankie, who was in the boat, and then continued:

"He appeared in the boat. Then I said, 'Where is Marie?' and he said, 'I don't know,' and then he said, 'O! here she is, Uncle Mont, lying down on the ground.' I went there, and found she was unconscious, and I opened her sack and tried to give her some water. Then I made some whisky sling, and got some down her throat. This occurred in the kitchen. In a minute or two she came to, and sputtered a little, and said, 'What is the matter?' and I said 'Never mind now,' and afterwards I asked her if she jumped off from the boat, and she said, 'No,' she fell off. She said her head was heavy. I raised her up, and she vomited. I raised her up partly off the floor, and she threw up; and I carried her upstairs and put her to bed, and she vomited again upstairs, and I went and got a cloth and wiped her face off. I broke open her neck or waist out by the boat where I found her. She was wearing a neck scarf that day, Her waist was fastened with a safety pin at the neck."

Later he undressed her, and she appeared to be asleep. Afterwards he went over to the cottage of Mr. Chase, which was only about 400 feet distant, and assisted in storing a boat. Upon his return he prepared some gruel for Marie, but when he went up to her room she apparently was asleep, and he returned down stairs, laid down on a couch, dropped asleep, and did not awaken until 6 o'clock next morning. He then called Marie, but, as she did not answer, he went to her room, laid his hand on her forehead, was startled at the touch, and, after pouring out some coffee for Frankie, went on foot for the doctor, to Livonia, 3½ miles distant. He rode back with the doctor, arriving at the cottage about 10 o'clock that forenoon.

We thus have the contradictory statements of these two witnesses concerning the chief transaction; the defendant testifying that he found the little girl lying near the boat, which was a small steamer, without any machinery in it, and which was over 40 feet in length, and at its bow the deck was nearly 5 feet above the ground; the little boy first telling the story as narrated by the defendant, but later that his sister was killed by De Garmo, and that his first story was given at the behest of the defendant. While the witness Frankie was sworn in this case, and no question seems to have been raised that he did not "possess sufficient intelligence to justify the reception of the evidence" (Code Cr. Proc. § 392; People v. Gralleranzo, 54 App. Div. 360, 66 N. Y. Supp. 514), yet in view of his immature years, and the fact that he testified contrary to his previous declarations, we would not feel justified in affirming the judgment of conviction unless there was other proof strongly tending to fix upon the defendant the brutal crime of which he has been found guilty. The record discloses three or four circumstances which shed light upon this occurrence, and which we will briefly analyze.

The theory developed by the defense was that the little girl, while gathering up the shavings from the boat, had fallen or jumped from the deck, striking on a plank which was turned up edgewise near the ground by the boat, and which formed part of a workbench. After she was discovered, and after she had vomited and was placed in bed, according to his narrative, he was at Chase's cottage; and, although he was evidently on friendly terms with the Chases, he gave no information that Marie had been injured. Again, although early the next morning he apprehended that she was dead, he did not go to their cottage to see whether they were at home, or stop anywhere else, but trudged to Livonia, three or four miles distant. If the testimony of Chase is to be credited, he did not intend to leave for Batavia that morning until 8 o'clock, although the defendant testified that Chase told him he was to go early in the morning; not stating any hour, however. The witness De Lavergne testified that he was at the De Garmo place the day the body of Marie was taken away, and had some conversation with the defendant, in which the latter told him his story about Marie falling from the boat, and finally said:

" 'I will tell you: I did give her one damned good thrashing, and gave her a good one with a shingle, and I just turned her up, and she had only one little garment on, and I gave her a good one, and she turned red, and then black;' and he says, 'I don't know whether they will be after me or not, but,' he says, 'I looked up the law last week, and I see where a man licked his wife, and she died, and they only gave him three years; and, by God! I can stand that all right enough.' "

The defendant, in repeating this conversation, said he told De Lavergne that the little girl fell or jumped off the boat and thereupon De Lavergne—

"Asked me if I was not a little shaky, or placed in a bad position, and I told him it looked bad. Then he said: 'You need not be scared. I read in the paper where a man beat or killed his woman, and he only got three years for it.' I am quite sure I did not make any reply to that. * * * I told De Lavergne that it looked bad. I do not know what made me say that. I do not know how long De Lavergne staid there."

Burt Chase testified that, when the defendant was assisting him in storing the boat, De Garmo asked what time he (Chase) intended to leave for Batavia next morning, and Chase said about 8 o'clock. De Garmo inquired why he did not drive through in the night, and added: "I think it advisable for you to get off from here before eight o'clock." Chase also testified that on the Sunday preceding the death of Marie he was at the De Garmo cottage, and noticed that the workbench on which the plank referred to was attached was north of the barn; that, on the Friday morning the child died, Chase observed the workbench near the boat, and where the defendant testified Marie had fallen.

Dr. Richmond, who came to the cottage with defendant from Livonia, discovered that Marie was dead, and later in the day performed the autopsy, and thus described the condition of the little girl's body:

"There was an abrasion over the lower portion of the abdomen, and there was another— An abrasion is a breaking of the skin. A contusion is when it is bruised. The skin was broken. An abrasion over the lower portion of the abdomen, and quite an abrasion below the left knee, and also one on each hip; and on each buttock there was an abrasion, and another on one of the thighs,—which thigh, I don't remember. There were discolorations that looked like bruises over the abdomen, and there was an abrasion on the back of the left hand and on the right elbow,—many of them an inch in diameter, and some longer,—and one on the right side of the head, above the ear, beginning a little back of the edge of the hair, about three-quarters of an inch wide, and an inch and a half to two inches long. That, as far as I am able to recollect, comprises the external features. Then, on opening the body, I found the intestines discolored; the head of the colon (the large intestine) quite black; and, on removing the skull cap of the head, I found a clot of blood upon the right side, on the posterior portion of the brain, somewhat irregular in shape,—a black spot, partly disorganized. It was black and friable, about three inches in diameter, not perfectly round, and, I should think, three-eighths of an inch thick. Speaking of the abdominal lesions, there was a clot in the left kidney, with some semipurulent matter, partly broken down. It was in the pelvis of the kidney. The kidney is located just here, at the side of the back,—just under the short ribs. It extends a little below and a little under the ribs. I think I have described all I can remember with reference to the conditions of this body found upon the autopsy."

He further said that, wherever he discovered an internal spot or clot of blood, it corresponded with one of the external injuries described by him, and that either the blood clot on the brain, or the one on the kidney, was sufficient to cause death. He went to the boat where the defendant claimed she had fallen, and did not "discover any blood, or anything of that kind."

These are circumstances of more or less weight for the jury to consider, bearing upon the narrative of Frankie Lennon that the defendant was responsible for the death of the little girl. It does not seem reasonable, if she had fallen from the boat, that her body would show the numerous external injuries in different parts of the body which the doctor found upon it. Again, if she was lying limp and unconscious when discovered by the defendant, with the severe injuries described, she would not be apt to revive and manifest the physical vigor and consciousness portrayed in the defendant's testimony. While there is no evidence of sufficient motive to justify the horrible crime which the verdict implies, yet there is some evidence

of brutal treatment of the little girl by the defendant, and evidence which tends to show a calloused disregard of the feelings of these children.   He testified that he whipped her with a shingle the Wednesday preceding her death.   A witness testified that at another time he struck her on the face and pushed her against the wall for a very slight, if any, provocation.   Another witness, that he heard cries from the De Garmo cottage of, "Montie, don't! please don't!" and the sound of blows accompanied the cries.   These were conflicting items of testimony, but they were for the jury to pass upon.   The evidence of Frankie Lennon should be scrutinized carefully.   But we are satisfied there was sufficient supporting testimony, so that the jury might well have concluded he had testified to the truth.   Apparently, the father and mother of the little girl were friendly to the De Garmos. There is nothing in the record to indicate that any one would wish to pervert the boy's mind, and create in it a fabrication to fix this heinous crime upon the defendant.

After the jury had been deliberating for a time, they returned into court and asked for instructions; the foreman saying:

"We desire to know whether we can find a different degree of manslaughter than the first degree."

The court replied:

"I will say to you that I don't think, under the evidence in this case, that you can find the defendant guilty of a lesser degree of manslaughter.   If you find that the defendant did strike these blows with the poker, and that they resulted in the death of the child, the defendant is guilty of manslaughter in the first degree.   If he did not strike them, he is not guilty in any degree.   You may retire."

There was no exception taken to this instruction.

The jury some time after found the defendant guilty of manslaughter in the first degree, with a recommendation to the court for mercy. We think the instruction of the court was correct.   Either the defendant committed no crime at all, or else he was guilty as charged in the indictment.   If he struck the little girl as described by her brother, he did it in a "cruel and unusual manner," and also while committing a misdemeanor.   A verdict of guilty of manslaughter in the second degree would have been unsupported by the evidence.   While it is within the province of the jury to find the defendant guilty of an inferior degree than that charged in the indictment, where the crime consists of different degrees, yet the evidence must show the defendant guilty of the precise crime found by the jury.   The jury may not seek to shield the defendant, or excuse their own consciences, by finding him guilty of some crime not proven against him.   As was said in People v. Downs, 56 Hun, 5, 8 N. Y. Supp. 521, at page 11, 56 Hun, and at page 524, 8 N. Y. Supp. (affirmed in 123 N. Y. 558, 25 N. E. 988):

"It is not right to convict a man of a less degree of crime, simply because a jury doubt whether he committed the greater.   Manslaughter is not half-proved murder, but the elements which constitute that less degree must be themselves proved."

Of whatever crime the jury found the defendant guilty, the evidence of Frankie Lennon must have been the basis of the verdict.   That is,

76 N.Y.S.—31

the verdict for any offense necessarily establishes that he struck this little girl several times with an iron poker with sufficient violence to fell her to the floor, producing the marked abrasions appearing upon her head and body, and causing her death within a few hours. If he did that, the punishment was inflicted "in a cruel and unusual manner"; and a conviction for manslaughter in the second degree would establish the contrary of this proposition, and would not be borne out by the evidence. Neither the question of the jury, nor the instructions of the court, related to anything but manslaughter in the second degree. However, we think the defendant could not properly have been convicted of any of the degrees of assault. In People v. McDonald, 159 N. Y. 309, 312, 54 N. E. 46 et seq., it was held that, if the defendant was indicted for a homicide, the jury were not warranted in finding him guilty of assault. The latter offense, in any of its degrees, was not a crime within the range of a homicide, and hence not within the compass of section 444 of the Code of Criminal Procedure, and was "not necessarily included in that with which he is charged in the indictment," so not within the permission given the jury by the succeeding section. Chapter 625 of the Laws of 1900 amended section 444, referred to, by allowing the jury to convict the defendant of assault where the indictment is for murder or manslaughter. That act, however, provides as follows:

"If the act complained of is not proven to be the cause of death, the defendant may be convicted of assault in any degree constituted by said act, and warranted by the evidence."

If the evidence of Frankie Lennon is to be credited, "the act complained of" was "proven to be the cause of death," and the evidence would not warrant a conviction for assault in any degree. There is no room in this case for a lesser offense. If the defendant's story is to be believed, he was free from any crime whatsoever. If the evidence presented on behalf of the prosecution is the correct narration, the defendant was guilty as charged in the indictment. The judgment of conviction and order should be affirmed.

Judgment of conviction and order affirmed, and the case remitted to the county court of Livingston county, pursuant to section 547 of the Code of Criminal Procedure. All concur.