(159 App. Div. 441.)

### HARDING v. CONLON et al.

(Supreme Court, Appellate Division, First Department. December 5, 1913.)

1. DEEDS (§ 199*)—EVIDENCE—RELEVANCY—RECORD IN PRIOR LITIGATIONS.

   In an action to set aside an alleged deed from defendant's husband, since deceased, as a forgery, the record of prior litigation between defendant and others, in which defendant sought to recover the property of her husband, which had no bearing on the case, except so far as one judgment tended to show the interests of the parties in the property in case the deed was declared void, was inadmissible.

   [Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 595–600; Dec. Dig. § 199.*]

2. ACKNOWLEDGMENT (§ 62*)—IMPEACHMENT—EVIDENCE—NOTARY—PRIOR OFFENSES—FORGERY.

   In an action to set aside a deed as a forgery, evidence that the notary who took the acknowledgment had been arrested, arraigned in police court, remanded, and indicted for another forgery, in no way connected in time, place, or parties with the matter in question, together with the indictment, and the fact that he was afterwards discharged on his own recognizance without trial, was incompetent.

   [Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 345–347; Dec. Dig. § 62.*]

3. ACKNOWLEDGMENT (§ 62*)—EVIDENCE—IMPEACHMENT.

   On an issue of forgery of a deed alleged to have been executed by a deceased grantor and acknowledged by a notary since deceased, evidence of an attorney concerning a conversation had with the same notary, indicating that the notary had previously been cognizant of or assisted in the forgery of a different deed, claimed to have been executed by a client of the witness, who was dead at the time of the alleged conversation, was inadmissible.

   [Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 345–347; Dec. Dig. § 62.*]

4. WITNESSES (§ 351*)—CONTRADICTION—CONTRADICTORY STATEMENTS.

   Where, in an action to set aside a forged deed, neither the notary nor R., both of whom testified, the former by deposition before his death, were asked concerning a conversation between them in which it was claimed the notary stated while incarcerated that the deed was "crooked," it was error to permit a police officer to testify that when the notary was in custody witness heard him say to R. that the deed in question was "crooked."

   [Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1150, 1151; Dec. Dig. § 351.*]

5. APPEAL AND ERROR (§ 1054*)—RULINGS ON EVIDENCE—EQUITY SUIT—PREJUDICE.

   Erroneous rulings on admission of evidence in an equity suit will not be held harmless, where the court's opinion affirmatively shows that he

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

considered the same in determining the case, and that it had a prejudicial effect.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4185, 4186; Dec. Dig. § 1054.*]

Appeal from Special Term, New York County.

Action by Winifred F. Harding, formerly Winifred F. Jones, against Eva K. Conlon and others. From a judgment setting aside the deed, defendant Conlon appeals. Reversed, and new trial ordered.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

Bertha Rembaugh, of New York City, for appellant.

Lewis S. Goebel, of New York City (George V. Grainger, of New York City, of counsel), for respondent.

Samuel Newmark, of New York City, for defendants Mission of Immaculate Virgin, etc., and another.

William C. Orr, of New York City, for Home for the Aged, etc.

CLARKE, J. This is an action to set aside a deed from John P. Conlon to his wife, Eva K. Conlon, as a forgery. In 1899 John P. Conlon died, seised, among other property, of the premises No. 121 Worth street, New York City, leaving a last will and testament which had been executed March 21, 1877, which was duly admitted to probate. On the 30th of March, 1907, there was recorded in the register's office of the county of New York a deed from John P. Conlon to Eva K. Conlon of the premises 121 Worth street, bearing date of May 14, 1897, and an acknowledgment as of that date taken before Frederick G. Anderson, notary public. This action was brought to adjudge said deed null and void as a forgery and that it be brought into court to be canceled and destroyed.

There was a sharply litigated question of fact as to the authenticity of this deed. 162 checks bearing the conceded signature of John P. Conlon, exhibiting considerable diversity, were admitted in evidence. Two handwriting experts were examined for the plaintiff who testified that in their opinion the disputed signature was not written by Mr. Conlon, and one expert was produced by the appellant who testified that in his opinion it was. While it was conceded that the acknowledgment was signed by Frederick G. Anderson, the notary, it was disputed that it had been signed by him upon the date which it bore, and seven conceded signatures of his were put in evidence, and the experts in handwriting testified in regard to the acklowledgment as well as to the signature to the deed. Three other papers purporting to be signed by John P. Conlon, and testified to as having been signed contemporaneously with the deed, and conceded to be written by the same hand that signed the deed, were also put in evidence. Fac similes of all these papers, including the deed and the acknowledgment, appear in this voluminous record.

The learned trial court said:

"The handwriting of the deceased shows many vagaries. From the many standards submitted the difference in style of signature is glaringly apparent.

* * * While the signature to the deed is a marvelous likeness of the genuine signature of the dead man, it is none the less, in my opinion, spurious. The case was peculiarly one for experts, but their evidence is not always to be relied upon."

He held that the deed was a forgery and gave judgment for the plaintiff.

Realizing that a sharp question of fact is here presented, that the case was tried at Special Term by a judge and without a jury, and mindful of the command of the statute expressed in section 1317 of the Code of Civil Procedure that, "after hearing the appeal, the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties," and without expressing any opinion upon the merits further than to say that if the errors had not been committed which we are about to point out we would not have interfered with this judgment as against the weight of evidence, we are of the opinion that it must be reversed and a new trial ordered, not for technical errors, defects, or exceptions, but for such as did "affect the substantial rights of the parties."

[1] There had been considerable prior litigation between Mrs. Conlon and persons claiming to be the heirs of John P. Conlon. The complaint itself alleges that subsequent to the probate of Conlon's last will and testament an action was begun in the Supreme Court of New York County entitled Winifred F. Jones, Plaintiff v. Mary Anne Kelly and Others, Defendants, 63 App. Div. 614, 72 N. Y. Supp. 24, for a construction of said last will and testament, resulting in a judgment entered on the 14th day of May, 1901, by which it was provided that the devise and bequest to the charitable corporations named in the will is valid only to the extent of one-half of the estate, after deducting from the whole estate the debts of said decedent and the dower of his widow, Eva K. Conlon, and decreeing who were the heirs at law to whom the remainder of the estate descended.

The plaintiff offered in evidence not only the judgment roll in said suit of Jones v. Kelly, but the interlocutory and final judgment in the case of Eva K. Conlon v. Mary A. Kelly and Others, filed June 29, 1900, and September 11, 1900, and the judgment and remittitur on appeal from the Court of Appeals in Eva K. Conlon v. Mission of the Immaculate Virgin and Others, filed July 18, 1905, over the objection that they were entirely irrelevant and incompetent and in no way affected this issue; the court saying:

"I will allow it so far as proving the allegations of the complaint; that is all."

The only one of said judgments which tended to prove any allegation of the complaint was that in Jones v. Kelly, establishing the interests of the parties in case the deed was declared void. And the only finding of the learned court in its decision directly based upon any of the said records is upon said judgment and to that effect.

The remittitur from the Court of Appeals in Conlon v. Mission of the Immaculate Virgin discloses that the plaintiff herein alleged that in consideration of certain services performed by the plaintiff for John P. Conlon, and in consideration of the agreement on the part of the

plaintiff to perform certain services for him, and in consideration of certain moneys paid over by the plaintiff to him, he, the said John P. Conlon, agreed with her that upon his death he would leave to her all the property of which he might die seised and possessed, and in pursuance thereof entered into a certain agreement purporting to effect the same; and demanded judgment that the said agreements between her and the said Conlon be carried out, and that it be adjudged that she is entitled absolutely and in fee to all of the estate, both real and personal, of which the said Conlon died seised and possessed. Judgment went against her in that case, which was affirmed in this court and in the Court of Appeals, and there appears in the remittitur the opinion of the trial judge which animadverts in strong language upon Mrs. Conlon.

The learned trial court, in the case at bar, in giving its reasons for its judgment that the deed was a forgery, which was the only issue here submitted, gives the history in extenso of this prior litigation and quotes verbatim from the opinion of the trial judge contained in the remittitur in Conlon v. Mission of the Immaculate Virgin, following it with this sentence:

"Defeated in her efforts to secure the property under the various papers mentioned, her next move was made on March 30, 1907, when there was recorded in the register's office what purported to be a deed from the deceased to her, purporting to convey to her a valuable piece of property in this city."

This record of this prior litigation was admitted over objection and exception upon the distinct ground that it was allowed "so far as proving the allegation of the complaint, that is all." It did not tend to prove any allegations of the complaint, nor was it made use of for that purpose. But it did serve the purpose, and was undoubtedly introduced therefor, of discrediting Mrs. Conlon, of making her appear quarrelsome and litigious, and of communicating to the court uncomplimentary remarks made by a prior court. In civil actions evidence may not be introduced of the base character of a party, and especially by alleged specific instances of such bad character.

[2] Plaintiff was permitted to prove, over objection and exception, and against a subsequent motion to strike out, that the notary, Anderson, had been arrested, arraigned in the police court, remanded to the Tombs, and indicted in September, 1907, for forgery, but in no way connected in time, place, or parties concerned in this case, and the indictment and its indorsements were received in evidence, from which it appears he was never tried, but discharged on his own recognizance. Upon this the learned judge commented in his opinion as follows:

"It appears that this is not the first transaction with which the name of Anderson was connected. He was indicted in October, 1907, several months after Mr. Carvalho's report, for falsely certifying that a certain deed of one Appleby was acknowledged before him, when in truth and in fact the said Appleby did not personally appear before him and was not at the time known to him."

That this evidence was incompetent and harmful to the last degree is established by the following cases, and its effect upon the trial court is shown upon his own opinion:

In People v. Morrison, 194 N. Y. 175, 86 N. E. 1120, 128 Am. St.

Rep. 552, the appellant had been convicted of the crime of petit larceny by the Court of Special Sessions for stealing five bushels of hard clams and one-half bushel of oysters, which conviction had been unanimously affirmed by the Appellate Division in the Second Department. Judge Vann said:

"The evidence for the prosecution was sufficient, if believed, to justify the conviction of the defendants. * * * After the defendant Morrison had testified, * * * he was asked during the cross-examination by one of the justices who presided at the trial: * * * 'Q. Did you, or did you not, say you are under indictment—do you know whether there is or is not an indictment pending against you, charging you with taking clams? A. Yes, sir; from this very bed.' We have recently held, and the law was well settled before, that 'the defendant, in an action either civil or criminal, cannot be asked on cross-examination whether he has been indicted, for an indictment is merely an accusation and no evidence of guilt.' People v. Cascone, 185 N. Y. 317, 334 [78 N. E. 287]. See, also, Van Bokkellen v. Burdell, 130 N. Y. 141, 145 [29 N. E. 254]; People v. Crapo, 76 N. Y. 288, 290 [32 Am. Rep. 302]. * * * The questions were asked by the court itself, and we cannot say what effect the answers had upon the minds of the justices, who, but for this evidence, might all have believed, as one of them apparently did believe, the testimony of the defendant Morrison. The judgment of conviction should be reversed and a new trial ordered."

Upon a motion for reargument (195 N. Y. 116, 88 N. E. 21, 133 Am. St. Rep. 780, 16 Ann. Cas. 871), Judge Vann said:

"The writer of this memorandum, who prepared the opinion of the court, in referring to said witness, designated him as the defendant Morrison, whereas he was not John Morrison, the defendant, but William Morrison, his brother; each having testified that the plat was not staked out. * * * For the mistake in referring to the witness by the wrong name the learned district attorney thinks he is entitled to a reargument of the appeal. His theory, apparently, is that as William Morrison is not a party there was no error in allowing him to testify that he had been indicted. The motion is founded on a misunderstanding of the rules of evidence governing the subject. A party called on his own behalf is simply a witness the same as any other witness. He is not sworn and does not testify as a party, but as a witness, and the general rules of evidence, both as to admissibility and methods of examination and cross-examination, apply to him in precisely the same way as to a witness who is not a party. * * * It is well settled in this state, and it was the rule before parties were allowed to be witnesses, that a witness may not be impeached or discredited by showing on his cross-examination or in any other way that he has been indicted. An indictment is a mere accusation and raises no presumption of guilt. It is purely hearsay, for it is the conclusion or opinion of a body of men based on ex parte evidence. The rule applies to criminal actions as well as civil, and to all witnesses, whether parties or not. As was said in a case decided as early as 1829: 'The credibility of a witness is not to be impeached by proof of a particular offense, but by evidence of general bad character. If it was not competent to prove that the witness had perpetrated the offenses for which he had been indicted (of which there could be no question), it follows, of necessity, that the fact of his having been indicted was inadmissible evidence.' Jackson v. Osborn, 2 Wend. 555, 558 [20 Am. Dec. 649]. The mistake was not material in any possible view of the case, and obviously could have had no influence upon the result."

[3] Mr. Wilder, an attorney at law, was called for the plaintiff in rebuttal and was allowed to testify over objection and exception, and a motion to strike out, that he had a conversation with Mr. Anderson the 1st of September, 1898:

"I asked Mr. Anderson whether he, on the 20th of May, 1892, had taken an acknowledgment of the execution of the deed running from John Baird to John Alleck. He said he undoubtedly had, as he knew a Mr. John Baird. I asked him whether he could, if I managed to bring a copy of his signature to him, identify it. He said he didn't think he could. I showed him some signatures of my client John Baird. Mr. Anderson, however, said that he could locate John Baird and send him to my office. I was anxious that he should do so, because my client who owned the property had died in the previous October, October, 1891. Thereafter, one or two men called upon me who offered to get quitclaim deeds or affidavits showing the ownership of John Baird in the property. I could never get any one to come to my office who would swear he was the John Baird who made the deed. As a matter of fact, John Baird who owned the property died owning it, some eight months before the deed that was acknowledged before Mr. Anderson was dated, or executed, or acknowledged."

Upon this testimony the learned court said:

"But more than that, the evidence shows other cases of like nature in which Anderson was concerned, in one of which an acknowledgment was taken by him six months after the death of the supposed grantor. The conviction is forced upon me that Anderson was a pliant tool for some person who made forgery his business, and when the emergency called for his aid he readily took the acknowledgment to such deeds."

The bare statement of such evidence seems enough to show its absolute incompetency.

In Potter v. Browne, 197 N. Y. 288, 90 N. E. 812, Werner, J., said:

"Equally well settled is the rule, violated by counsel, that although a witness may be discredited or disgraced by his own admissions upon cross-examination, that collateral issue cannot be pursued to the extent of accomplishing the same result through the acts and declarations of others. The reason of the rule is obvious. Since the credibility of a witness is a purely collateral issue, the cross-examining counsel is bound by the answers elicited by the questions pertinent to the subject. This rule is rendered necessary to the orderly and expeditious administration of justice. Without it collateral issues might be multiplied ad infinitum. But it is also necessary because it would be repugnant to the plainest principles of justice to permit a witness to be discredited by another who testifies merely to declarations of his own thoughts and acts. A witness may upon cross-examination be compelled to disclose any vicious or criminal act of his life, unless he asserts his privilege. Such testimony bears simply upon his credibility. If the effort to obtain such admissions fails, however, it cannot be supplemented by the declarations of other witnesses. Stokes v. People, 53 N. Y. 164 [13 Am. Rep. 492]; People v. Greenwall, 108 N. Y. 296 [15 N. E. 404, 2 Am. St. Rep. 415]; People v. Webster, 139 N. Y. 73, 84 [34 N. E. 730]; People v. De Garmo, 179 N. Y. 130 [71 N. E. 736]. It is suggested by counsel for the plaintiff that even if the evidence thus introduced by him was incompetent it was harmless. If that were plainly shown by the record, the error might be overlooked. The indications and probabilities are, however, all the contrary. The main issue in the controversy, which was closely contested, depended in large upon the testimony of Claxon. If the jury had believed him, they would probably have found a verdict for the defendant. The verdict for the plaintiff necessarily implies a lack of confidence in the credibility of this important witness. We cannot say that the method by which his credibility was attacked was not the most persuasive factor in the case."

Judgment was reversed and a new trial ordered.

People v. De Garmo, 179 N. Y. 130, 71 N. E. 736, was an appeal from the judgment of the Appellate Division affirming the conviction of the defendant of the charge of manslaughter in the first degree.

The defendant was a witness in his own behalf. On his cross-examination he was interrogated as to a number of alleged occurrences which had no legal connection with the homicide, and his testimony thus elicited was then permitted to be contradicted by witnesses called in rebuttal by the prosecution. Werner, J., said, writing for a unanimous court:

"But such testimony was not material to the main issue, and bore simply upon his credibility. The evidence was not competent to prove that he was criminally inclined, or to establish his probable guilt of the crime charged because of his commission of other offenses, but only to show that his testimony was unworthy of belief. * * * At this point we encounter one of the limitations of the rule governing the impeachment of witnesses that was lost sight of in the case at bar. When the credibility of the defendant as a witness was assailed by compelling him upon his cross-examination to give testimony which, although competent for purposes of impeachment, was collateral to the main issue, the prosecution, at whose instance the collateral evidence was elicited, was bound thereby, and had no right to contradict it. This is an inflexible limitation of the rule referred to. * * * The admission of such evidence raises a conclusive presumption of injury to the defendant, and renders the reversal of the judgment herein an imperative necessity."

[4] Lieutenant Nelson of the police, who was permitted to swear that when Anderson was in custody in the Tombs he heard him say to Mr. Rosenberg, referring to the Conlon deed, that it was "crooked." Mr. Rosenberg was permitted to testify that, when he saw Anderson in the Tombs and procured two affidavits from him in regard to the Appleby matter:

"'Anderson asked me whether we intended prosecuting him for forgery in connection with that deed. We were talking about the Conlon deed. I told him that it was a matter for the district attorney. Q. Did he say anything as to the Conlon deed, as to whether it was a genuine deed or not? A. He did; he said it was a crooked deed."

There would be a serious question as to the weight to be given to this evidence for this reason: The witness testified that Anderson stated he was perfectly willing to put in writing (as he was putting in writing in that affidavit referring to the Appleby deed) everything he had done in connection with the Conlon matter and what he had to do with it. But Rosenberg further testified that Anderson did not state everything he had to do with it, and that he never got from Anderson a single line in reference to the Conlon matter, although he was then working for the attorney for the plaintiff, expected to be retained by him, and was subsequently paid. Irrespective of the question of weight, however, the objection to the evidence is that, Anderson not being a party to the case, but merely a witness, statements made by him were only admissible to contradict evidence given by him upon the trial relevant to the issues. He had been examined before trial, as a sick man while lying in a hospital in Brooklyn, under an order for his examination, and at the time of the trial was dead.

Before such alleged contradictory statements in regard to the issues in the case can be received, the witness to be contradicted must have had his attention drawn specifically to the time, place, and person, and the proper way to impeach is to ask the impeaching witness the questions propounded to the witness sought to be impeached.

"In case the statements are oral, the warning is given by asking the witness, in substance and effect, if he did not at a given time and place, in the presence of or to a person or persons specified, make the alleged contradictory statements."  Larkin v. Nassau Electric R. R. Co., 205 N. Y. 267, 98 N. E. 465.

No such course was taken in this case.  The examination of Anderson will be searched in vain to find any allusion whatever to a conversation in which he stated that the Conlon deed was a "crooked deed."  He was asked no such question.  Therefore no foundation was laid for this impeaching evidence.  Rosenberg was present at that examination of Anderson and assisted counsel.  This examination took place a year and a half before the trial.

Furthermore, Rosenberg was asked:

"Now with reference to the Conlon deed, and excluding that which you have already testified to, what questions did you ask him?"

And he proceeded to give, under objection and exception, the substance of the questions and the purport of the answers.  And of this testimony the learned court says:

"But Anderson was otherwise discredited.  While in prison on the Appleby charge he admitted to at least two persons that the deed which is the subject of this action was a crooked one.  True, Anderson before his death denied that he ever made such admission, but nothing in his record justifies the inference that the two witnesses referred to are to be discredited on account of such denial.  I am not unmindful of the rule that 'courts of justice lend a very unwilling ear to' statements of what dead men had said,' but it was never intended to apply such rule to a case like the one at bar."

[5] If this had been a jury trial, the admission of the oral evidence in regard to the arrest and indictment of Anderson, and the indictment itself, would have alone been sufficient to have caused the setting aside of the verdict and a reversal of the judgment.  The rule in regard to cases tried before the court alone is much more liberal, and, if the reviewing court can see that the improper evidence could not have affected the result, the error is overlooked as harmless.  In this case we are not left in doubt, for the Special Term with great care and explicitness has reviewed in its opinion the very evidence referred to, and it is impossible to say that the mind of the learned judge was not thereby affected when he came to decide the main issue as to whether the deed was forged or not, upon which there was a sharp issue of fact.

In Weibert v. Hanan, 136 App. Div. 388, 121 N. Y. Supp. 35, in reversing a judgment entered upon the report of a referee where concededly incompetent evidence had been admitted, a majority of the Appellate Division of the Second Department said:

"The decision in this case seems so eminently just that the court should not be astute to seek for grounds upon which to reverse this judgment.  Unless an error upon a trial is so substantial as to raise a presumption of prejudice, it does not require a new trial and should be disregarded."

But the Court of Appeals (202 N. Y. 328, 95 N. E. 688) reversed; Judge Bartlett, writing for a unanimous court, saying:

"We are unable to concur with the prevailing opinion in the Appellate Division that it was not substantial enough to raise a presumption of prejudice.

The fact that the referee is a lawyer of recognized ability who has rendered most capable service to the public in a judicial capacity in no wise tends to justify the inference that his judgment was not influenced or affected by evidence which he admitted into the record against the clearly and carefully stated objection of counsel. On the contrary, it seems to us the presumption is just the other way. The ruling was equivalent to an express declaration on the part of the referee that he regarded the evidence which he thus admitted as entitled to probative force; and a perusal of all the testimony indicates that in all probability he did assign considerable weight to the evidence in question in reaching the conclusion that the plaintiff was entitled to prevail in the action. The case would be very different if the referee had stricken out the objectionable testimony and had stated in his report that he had decided the issues wholly on the other and proper evidence in the record without regard to that thus eliminated from consideration. An appellate court might well have confidence that an experienced referee or trial judge would be able to disregard testimony which he had originally admitted under the mistaken impression that it was properly receivable. Nothing of the kind was done here, however; and we cannot resist the conclusion that the issues in this action were determined against the defendant upon objectionable evidence which affected the decision."

In the case at bar there is nothing for inference. It affirmatively appears that the objectionable evidence affected, if it did not control, the result.

For the errors pointed out, this judgment must be reversed, and a new trial ordered, with costs to the appellant to abide the event: All concur.