THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RICHARD NIEVES, Appellant.

First Department, April 7, 1988

APPEARANCES OF COUNSEL

*Stephen D. Chakwin, Jr.,* for appellant.

*Billie Manning* of counsel *(Paul T. Gentile,* attorney), for respondent.

## OPINION OF THE COURT

CARRO, J.

Defendant Nieves and codefendant Quiles stood trial for the murder of Nieves' long-time friend, Robert Smith, in a most perplexing and disturbing case in which one State witness testified that defendant was not present during the fatal shooting; another witness, who had implicated defendant in the shooting in her Grand Jury testimony, recanted prior to trial and could not later be located to testify; and the one trial witness to connect defendant to the shooting, the victim's sister, implicated the defendant only after being confronted with her prior Grand Jury testimony.

Recognizing the weakness of the evidence, and because the trial testimony revealed that a person other than the two defendants committed the actual fatal shooting of Smith in the back, the court, over defendant's objection and despite the prosecutor's warning that it might be committing reversible error, submitted an assault charge to the jury, as a lesser included offense of murder, on the theory that defendant may have shot Smith in the foot. Not surprisingly, the jury acquitted defendant of second degree murder, but found him guilty of assault in the second degree for shooting Smith in the foot. We reverse defendant's conviction since under the facts of this case assault in the second degree should not have been submitted as a lesser included offense of murder.

On June 14, 1982, at approximately 5:20 P.M., Robert Smith was shot and killed after being suddenly confronted by a group of youths who were allegedly retaliating for a theft of a radio Smith had supposedly committed. The shooting took place at a basketball court in a park in The Bronx. Beyond this, few details about the shooting were established at trial with any degree of certainty. The weakness of the State's case against Nieves was revealed early in the trial, when the first

witness called, David Martinez, testified that Nieves was not even present at the shooting.

Martinez was at the park on June 14, 1982, at around 5:00 P.M., when he saw two men who went by the "street names" White Boy and Orva get out of a yellow car and approach Robert Smith and Smith's friend, Robert Williams, who were standing on a park bench. The men argued for a few minutes before White Boy and Orva departed in their car. About five minutes later, a group of around 12 men came running into the park from 149th Street and Trinity Avenue. Martinez saw codefendant Quiles in that group. About half of that group began to chase Robert Williams and half went after Robert Smith.

One young man grabbed Smith and dragged him over to the basketball court. Another man handed to codefendant Quiles a .32 or .38 calibre black revolver. Clenching the revolver in his right hand, Quiles rushed toward Smith, aimed the gun at him, and made a downward motion with his hand. Martinez never heard a shot fired from the gun, but saw Smith move backwards when the gun was aimed at him. Suddenly, Orva appeared and said in Spanish "move out of the way, I am going to shoot him." The men who were holding Smith managed to get him face down on the ground. As they stepped away, Orva shot Smith twice, hesitated and then shot him for a third time with a .32 calibre nickel-plated revolver.* Quiles, meanwhile, had run away before any of the shots were even fired. Martinez, who had known defendant Nieves for over 11 years, did not see Nieves at the shooting.

The next prosecution witness was Margaret Lisa Smith, the sister of Robert Smith. She testified that she had been in the park with a friend, Lita Maxwell, for about two hours before the incident. She was sitting on one park bench with Lita, while her brother and Williams were sitting on another bench. The next thing she saw happen was that her brother "got in the park, he was running, all of them surrounding him, he was running and got shot in the foot first." She testified that codefendant Quiles shot her brother with a gray gun. She saw someone pass the gun to Quiles, but she did not know who that person was. She did admit, however, to knowing defendant Nieves and pointed to him in court.

---

* Detective John Sullivan, who was, until the time of trial, still investigating this homicide, testified that he had not yet been able to locate Orva for the murder of Robert Smith.

Because Ms. Smith had testified before the Grand Jury that she saw Nieves pass the gun to Quiles, the prosecutor informed the court that he would proceed under CPL 60.35 (1), to impeach his witness with that prior sworn testimony. Nieves' counsel pointed out that because the prior statement could not be admitted for its truth, the People in effect would have no direct evidence linking Nieves to the shooting, especially since the other witness who had implicated Nieves before the Grand Jury, Lita Maxwell, had recanted her testimony. After first eliciting from Ms. Smith her reluctance to testify, the prosecutor then proceeded to impeach her:

"Q Do you recall testifying in the Grand Jury in this case?

"A Yeah.

"Q Do you recall being asked this question and giving this answer:—

"MR. RASKIN: What is the page?

"MR. HRAPSKY: Page 4W, at the top.

"Q 'QUESTION: Did you see anybody else with the gun besides Little Man [Quiles]?' and the answer was 'Tiz [Nieves] passed it to Little Man.'

"Did you testify to that in the Grand Jury?

"A I think so.

"THE COURT: Do you understand the question, the question is whether you testified a certain way before the Grand Jury and he read your testimony to you, did you testify that way in the Grand Jury?

"Did you? Ms. Smith, did you testify that way in the Grand Jury?

"THE WITNESS: I forget.

"THE COURT: Is your answer yes?

"THE WITNESS: Yes, yes.

"Q Ms. Smith, is that the truth?

"A I said yes.

"THE COURT: Ladies and gentlemen, I instruct you as a matter of law that this testimony, this witness' testimony before the Grand Jury is not in evidence in this case, it is simply introduced for the purpose of showing that she testified differently before the Grand Jury and it is not evidence in chief, in this case, it only goes to her credibility that's all.

"Q Ms. Smith, I ask you now, did you see who passed the gun?

"A Yes.

"Q Who passed the gun to Little Man?

"A Tiz [Nieves].

"I want to go home."

Ms. Smith reluctantly continued her testimony, testifying that a second person then came forward and shot her brother in the back, but she did not "know his face". Her earlier accounts of the shooting never mentioned a second shooter.

Ms. Smith revealed a marked inability to remember any details of the shooting. Although she saw Quiles shoot her brother in the foot, she could not provide any details of Quiles' actions. As to the second man who shot her brother, Ms. Smith could not give any description of his physical appearance, his clothing, where he stood in relation to her brother, or how many shots he fired. Ms. Smith could not remember how many people were standing around the person who shot her brother in the back. She would not even say if there was more than one person. As hesitating, unclear, and unspecific as her testimony was, it nevertheless formed the crux of the People's case against Nieves.

The only other testimony linking Nieves to this incident came from Robert Smith's mother. At about 5:00 P.M. she received a telephone call, transmitted from the building's intercom system, from a person saying he was "Tiz" (defendant Nieves) and asking to speak with her son Robert. Mrs. Smith knew Nieves and recognized his voice. As her son answered the call, Mrs. Smith went to her bedroom to listen to the conversation on another telephone. She heard Nieves ask her son to "come on downstairs, the fellow wants to squash everything and get everything settled and make up." After quickly finishing his dinner, her son went outside. Mrs. Smith also left her apartment soon after the call. About 20 minutes later, after having received a telephone call at work from her daughter Margaret, she went to the park and identified the body of her slain son.

People's witnesses Rosalia Iglesias and Antonio Crespo barely saw the shooting and were unable to identify any of the participants. As Iglesias looked out of her window overlooking the park at about 5:15 P.M., she saw one man holding a silver gun while a black man fell to the ground. She then heard two shots, after which the armed man ran. Antonio Crespo looked out of his window between 5:00 and 5:15 P.M.

and saw someone on the ground and two Hispanic men running.

The autopsy revealed that Smith had three bullet wounds. One entered the right side of the midback and penetrated the chest cavity, lacerated the right lung and the heart, and was the cause of Smith's death. A second bullet grazed the skin of the back, resulting only in a superficial wound. That bullet was not recovered. The third bullet entered the left foot but did not penetrate any bone. The bullets recovered from the back and the foot were both .32 calibre bullets and were discharged from the same gun.

The defense case consisted of the testimony of Robert Reyes and Frolian Vasquez. Reyes testified in a very confusing manner about the incident. Just before the shooting occurred, he was heading towards a phone booth across the street from the park to place a telephone call. At that moment he saw Robert Williams being chased by a group of men and run past the doorway of a building. Reyes heard shots and saw Williams bleeding from the neck. As Reyes turned around and headed back to the park, he saw Robert Smith running and repeatedly yelling "help me". Smith grabbed onto a woman, but one of the men chasing him, Fred Ortez, pushed the woman away from Smith. He heard someone else say to Smith, who was now on the ground, "you like to steal" and then heard about four shots. Reyes could not see the shooter, and, because of the crowd of people, could only see Smith's legs. He saw Smith's foot bleeding. Reyes never saw Nieves or Margaret Lisa Smith at the park. He did see White Boy there and testified that there were some physical similarities between Nieves and White Boy.

Frolian Vasquez, a former correction officer, who at the time of trial was waiting to start employment as a New York City firefighter, also knew defendant Nieves from the neighborhood but was not friends with him. He was sitting on a bench in the playground when he saw three Puerto Ricans chasing "Crusader Rob" (Robert Williams) through the park.

After witnessing the assault on Williams, Vasquez turned to his right and saw that someone had grabbed Robert Smith and was dragging him through the playground. He saw Smith manage to pull away and begin to run out of the playground. Smith then grabbed onto a woman, but another person pulled the woman off Smith. Smith was now on the ground and a man with a gun said "you like stealing". Another man said

"shoot him". The armed man fired his gun, wounding Smith's foot. While Smith was still struggling to get up, the man shot him twice more. Even after the third shot, Smith kept trying to get up.

Vasquez knew Margaret Lisa Smith and saw her arrive at the park after the shooting. Vasquez did not see defendant Nieves in the park.

Pursuant to the request of codefendant Quiles, but over defendant Nieves' objection, the court agreed to submit as to Quiles the charge of assault in the second degree as a lesser included offense of the second degree intentional murder charge. Because the prosecutor believed that the court could not charge a lesser included offense as to only one defendant, he requested that the same be charged as to defendant Nieves. However, when it became clear that the basis for the court's assault charge would be the separate injury to the foot, the prosecutor objected, arguing that the court had "created a dichotomy between the acts as to the shooting in the foot and the shooting in the back." Aware that no evidence had been submitted as to the seriousness of the foot injury, the prosecutor also argued that the jury "will not find serious physical injury because it was only a bullet in the foot". The jury acquitted defendant Nieves of murder but found him guilty of assault in the second degree. We reverse this conviction.

The term lesser included offense is defined in the Criminal Procedure Law (CPL) in the following manner: "When it is impossible to commit a particular crime without concomitantly committing, by the same conduct, another offense of lesser grade or degree, the latter is, with respect to the former, a 'lesser included offense.' " (CPL 1.20 [37].) CPL 300.50, in turn, governs when a lesser included offense may be submitted to the jury. It provides that the court may in its discretion, or must when requested to do so, submit any lesser included offense, "if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater." (CPL 300.50 [1].) To eliminate the confusion caused by the abstractness of the statutory definition of a lesser included offense, the Court of Appeals in *People v Glover* (57 NY2d 61) and *People v Green* (56 NY2d 427) developed a two-tiered test to be applied by courts before submitting a crime as a lesser included offense. Under this test, the trial court must determine whether: "(1) considering in the abstract the Penal Law definition of the crime charged in the indictment in relation to the

Penal Law definition of the claimed lesser included offense, is it theoretically impossible to commit the greater crime without at the same time committing the lesser; (2) is there a reasonable view of the evidence in the particular case that would permit the jury to conclude that the defendant committed the lesser but not the greater offense." *(People v Green, supra,* 56 NY2d, at 430.)

In the abstract it cannot be doubted that second degree assault, as defined under Penal Law § 120.05 (1) is a lesser included offense of second degree murder under Penal Law § 125.25 (1). It is impossible to commit an intentional killing without also concomitantly committing by the same conduct a serious physical injury as that is defined in Penal Law § 10.00 (10). *(See, People v Mendez,* 63 AD2d 69, 71.)* However, under the facts of this case, there is no reasonable view of the evidence which would support a finding that defendant committed the lesser, an assault, but not the greater, a murder.

The conduct forming the basis for the murder charge was the intentional shooting of Robert Smith with a deadly weapon. The expert medical testimony proved beyond any doubt that Robert Smith died as a result of the shot to the back which penetrated his right lung and his heart. If we accept the People's theory that defendant was present at the shooting and participated and aided the person who intentionally shot Williams in the back, there is still no reasonable view of the evidence to support a finding that defendant intentionally and seriously injured, but did not kill, Smith.

Typically, the charge of intentional assault is submitted as a lesser included offense of intentional murder when the People are unable to prove at trial that the conduct charged in the indictment was the cause of death. For example, in *People v Mendez* (63 AD2d 69, *supra)* although the victim died 10 months after being brutally beaten by the defendant, the medical examiner could not establish beyond a reasonable doubt that the death was a direct result of the assault. Accordingly, it was proper to reduce the murder charge to second degree assault. *(Supra,* at 72.)* Interestingly, under the statutory predecessor to CPL 300.50, former Code of Criminal Procedure § 444, the jury was permitted to convict a defendant of assault under an indictment charging murder of manslaughter only "if the act complained of is not proven to be the cause of death." Conversely, when the act complained of indisputably causes death, "[t]here is no room * * * for a lesser offense" of assault. *(People v De Garmo,* 73 App Div 46,

54, *revd on other grounds* 179 NY 130; *see also, People v Thomas,* 29 AD2d 986, 987; *People v Wheeler,* 79 App Div 396, 397.)

Given the legitimate interest of the State in seeking a verdict on the highest offense supported by the facts, and the societal interest in not having juries render compromised verdicts in difficult cases *(see, People v Boettcher,* 69 NY2d 174, 183), no lesser should be charged "where the evidence essential to support a verdict of guilt of the [lesser] necessarily proves guilt of the greater crime as well." *(People v Mussenden,* 308 NY 558, 563; *see also,* CPL 300.30 [1].)

The trial court, however, committed a far more basic error in submitting the assault charge when it instructed the jury to consider the assault only in "relat[ion] to the shooting of Robert Smith in the foot, which was not and did not cause death."

Basic to the idea of a lesser included offense is that the lesser be concomitantly committed by the same conduct which forms the basis for the greater. This requirement can be found in the statutory definition of a lesser included offense, CPL 1.20 (37), and in the two-pronged test formulated in *People v Glover (supra)* and *People v Green (supra)* where in addition to the reasonable view of the evidence test, it must also be proven to be "impossible to commit the greater crime without *at the same time* committing the lesser". *(People v Green, supra,* 56 NY2d, at 430; emphasis added.)

*People v Schiavi* (96 App Div 479, *appeal dismissed* 180 NY 546) a Fourth Department case, is particularly helpful in illuminating this requirement of concomitant conduct. Defendant Schiavi and his brother were indicted for manslaughter in the first degree for the fatal stabbing of Antonio Perfetti in the abdomen. The stabbing occurred during an altercation between the two Schiavi brothers on the one side and Antonio Perfetti and his brother Antolena on the other. Since the People's witnesses could not identify who stabbed Antonio in the abdomen, the People had to rely on whatever inference could be drawn from the evidence that defendant himself, or as his brother's accomplice, committed the fatal wound. The defense version was that Antolena, as he tried to stab defendant, who jumped aside, instead stabbed his own brother in the abdomen. It was undisputed that all the participants were cut with knives in various parts of their bodies. It was also beyond contention that Antonio died of the stab wound to the abdomen.

The jury failed to find the defendant guilty of manslaughter but convicted him of assault. The appellate court interpreted the jury's verdict as a finding that although the "act complained of" in the indictment, the fatal stab wound, was committed and did cause death, it was not defendant who committed it. *(Supra,* 96 App Div, at 483.)* Despite the fact that the indictment never charged defendant with any other act but the stabbing which resulted in Antonio's death, the jury convicted defendant of assault. The Fourth Department found that while the verdict was supported by the evidence, since other stab wounds besides the abdominal wound were committed, the assault was nevertheless improperly submitted as a lesser offense of the manslaughter charge, since the assault was based on conduct which did not "form a component part of the act, of the stabbing in the abdomen, of the wound indisputably fatal which the jury held was not committed at all by the defendant." *(Supra,* at 485.)*

Accordingly, an offense is a lesser included offense of another when the conduct resulting in the lesser offense flows from or forms a component part of the act complained of in the indictment, or, stated differently, when the lesser is concomitantly committed by the same conduct that forms the basis for the Grand Jury's indictment on the greater.

Defendant Nieves was indicted for second degree murder under the theory that aided by others and acting with the intent to cause death he caused the death of Robert Smith by shooting him with a deadly weapon. Given the undisputed medical testimony that Smith was in fact killed by a shot to the back, the jury's acquittal of murder necessarily translates into a rejection of the prosecution's theory that Nieves acted in concert with Quiles and/or the second shooter in shooting the victim in the back. Having been acquitted of committing the act complained of in the indictment, which indisputably occurred and occurred in the manner alleged in the indictment, defendant could not, under the theory of a lesser included offense, be charged with an assault to the foot, an act which, given the jury's verdict, was not found to have been a component part of nor was concomitantly committed by the same conduct which formed the basis for the offense charged in the indictment. Accordingly, the assault conviction must be reversed as an improper lesser included offense.

■ Additionally, even assuming some proper theoretical basis for submitting assault in the second degree as a lesser

included offense of this murder charge, the evidence herein did not warrant a finding that defendant shot Smith in the foot and caused a serious physical injury. Initially, we note that, as even the People recognized at trial, there was no evidence submitted to support a finding that the shot to the foot constituted a serious physical injury as defined in Penal Law § 10.00 (10), namely, that the shot created a "substantial risk of death * * * or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." The testimony was simply that the bullet entered the foot and was lodged in tissue. The bullet never even penetrated any bone.

Secondly, there was no testimony at trial to explain in a satisfactorily credible manner and consistent with the physical evidence how two shooters managed to shoot Smith with the same gun, yet did not act in concert in killing Smith. While Margaret Lisa Smith testified that defendant handed a gun to Quiles, who then shot her brother in the foot, she never testified that Quiles then handed the gun to the second shooter. Yet, it is beyond dispute that only one gun was used. In fact, Ms. Smith's testimony seemed to imply that the second shooter simply came forward on his own to shoot Smith. To warrant a finding that Nieves is guilty of assault, the inference must be drawn from both Ms. Smith's testimony and the physical evidence that the same gun was in fact transferred to the second shooter, who the jury obviously found was alone responsible for the fatal shot to the back. We are unable to accord this theory of guilt, strained as it is, any weight, since a necessary predicate for it is Ms. Smith's contention that defendant Nieves was present at the shooting, a contention we find is against the weight of the evidence. Ms. Smith's testimony not only conflicted tremendously with that of the other witnesses, but simply did not possess sufficient indicia of reliability to have been accorded more weight than the testimony of other witnesses.

For instance, Martinez' testimony, in comparison to that of Margaret Lisa Smith, was clearer, more internally consistent, more detailed, and better corroborated by the other evidence in this case. More to the point, he never saw Nieves in the altercation that resulted in Smith's death. While other witnesses also did not see Nieves, Martinez' testimony was especially persuasive on this important fact. Unlike the two defense witnesses who testified they did not see Nieves, Martinez' attention was not distracted by the simultaneous assault

going on across the street against Williams. In fact, Martinez was sufficiently attentive to be able to identify Quiles and Orva as participants in the Smith shooting. He testified that Orva, armed with a .32 calibre nickel-plated revolver, shot Smith three times. Consistent with this testimony, the autopsy revealed that Smith was shot three times and the ballistics report stated that the two bullets recovered from the deceased were fired from the same gun and were .32 calibre bullets. While Martinez' testimony that Quiles aimed his gun at Smith but apparently never fired it may appear strange, it is again consistent with the physical evidence and the testimony of the other witnesses, none of whom testified there were two shooters.

Martinez' confident assertion that Nieves was not a participant in the affray was supported by the fact that he had known Nieves for 11 years and presumably would have recognized him had he seen him. That he did not merely fail to see him is made less likely by the fact that his attention was clearly focused on the very people who were at the center of the confrontation with Smith. Thus, it is not that he did not see who passed Quiles the gun, but rather that this person was not Nieves. Finally, it should be noted that Martinez was a State witness and unlike Ms. Smith testified willingly and with sufficient depth and clarity to make his testimony credible.

The testimony of Margaret Lisa Smith, on the other hand, must be accorded very little weight. Viewing her testimony in its entirety, we are unable to attribute her hesitancy to implicate Nieves in the shooting until after being confronted rather forcefully by both the court and prosecutor with her prior sworn testimony simply to nervousness or fear. Overall, her testimony was not straightforward, lacked clarity, and revealed a total inability to recall even basic details of the shooting. Additionally, her testimony was inconsistent on major points with prior statements she had made about the shooting. For instance, at trial was the first time Ms. Smith proffered the second shooter theory. Curiously, she could not describe this person at all beyond saying he was Puerto Rican. Ms. Smith's demeanor on the stand, as is apparent from just a reading of the record, evidenced hostility, confusion and, in general, a strong hesitation to testify. She constantly interrupted her testimony with statements that she wanted to go home, she felt sick, she was scared and she had to go to the bathroom.

Evaluating her testimony in its entirety for inherent trustworthiness, we are unable to accord it sufficient weight to warrant a finding that Nieves was present at the shooting. Comparing it to the more reliable testimony of Martinez, and keeping in mind that two defense witnesses testified that Ms. Smith was not present at the shooting, we are left with a very nagging doubt as to whether Ms. Smith really witnessed the shooting.

While the testimony of the two defense witnesses who also testified that Nieves was not present may not warrant being accorded great weight, since those witnesses were distracted by the apparently simultaneous viewing of the Williams shooting, it can equally be said that their testimony did nothing to add any weight to the People's case against Nieves. In fact, the only other evidence linking defendant to the incident was the testimony of Robert Smith's mother, who testified that it was Nieves who called and requested that Smith come outside because "the fellow" wanted to settle things. This, however, does not dispositively place defendant at the shooting, prove his intent to kill or assault Smith, nor prove he did participate in the actual shooting. Considering that defendant and Robert Smith were long-time friends, it is as plausible to draw from this testimony the inference that Nieves could himself have been used as part of the ploy to arrange for Smith to come outside, as it is to draw the inference that defendant was a willing participant in a plan to seek revenge on Smith.

In sum, there was no theoretical or factual basis for submitting a second degree assault charge against Nieves, and this conviction must be reversed.

Accordingly, the judgment of Supreme Court, Bronx County (Fred Eggert, J.), rendered September 6, 1983, convicting defendant, after a jury trial, of assault in the second degree and sentencing him to an indeterminate term of imprisonment of from 2 to 6 years, to be served consecutively to a term of imprisonment of 1 year pursuant to Bronx County indictment number 845/82, should be unanimously reversed, on the law, and the indictment should be dismissed.

SANDLER, J. P., KASSAL, ELLERIN and SMITH, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered on September 6, 1983, unanimously reversed, on the law, and the indictment dismissed. The matter is remitted to the trial court

for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this court's order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.