### Court of Appeals.

*December,* 1890.

*(Affirming* 7 *N. Y. Crim. Rep.* 481.)

## PEOPLE *v.* DOWNS.

*Homicide—charge to jury—burden of proof.*

The rule that in criminal cases the defendant is entitled to the benefit of a reasonable doubt applies not only to the case as made by the prosecution but to any defence interposed.

The mere fact of killing raises no legal implication of the crime of murder, and a charge of the judge to the jury upon a trial for murder is erroneous which is calculated to impress upon the jury a conviction that proof of the homicide carries with it a legal implication of crime, which shifts the burden of proof upon the prisoner and requires him to satisfy the jury that the killing was either justifiable or excusable at the peril of a conviction if he should fail in his attempt.

On a trial for homicide, the judge charged the jury after reading the definitions of the statute, and fairly and correctly explaining its classification of the different forms of homicide: "Now it is for you to say to which one of these classes of crime this evidence points. Here has been a homicide. Here has been a human life taken. It becomes a serious question as to whether or not a man should execute the law or execute vengeance upon his fellow. If he does so, he must do so either at the peril of being punished for it, or being able to excuse himself when called upon to answer for the wrong, within one of the excuses that is fixed and given in the law. If he is not, he must be found guilty of one or the other of the crimes which are imputed to him by reason of the homicide. . . . If you wish to reach the conclusion that he is justified in taking the life of this man within the definitions given in the books, not within any notions of your own, but within the definitions given in the law, if you reach the conclusion that he was justified, then

your verdict will be one of acquittal." *Held*, to be erroneous as conveying to the jury the idea that to acquit they must reach the conclusion that a justification has been established by defendant, and that a conviction must follow unless defendant has justified or excused the act.

While the jury may infer the legal implication of the crime of murder from the bare fact of a homicide, even though no motive be assigned for the act, and the case be bare of circumstances of explanation, yet the inference is one of fact which the jury must draw, if such seems to them to be their duty, and not one of law, which the court may impose upon their deliberation, and then, upon that assumption, shift the burden upon the prisoner and require him to prove that no crime has in fact been committed.

Appeal by defendant, George Downs, from a judgment of the general term in the third department, affirming a judgment entered upon a conviction of manslaughter in the first degree, in the court of oyer and terminer, of Rensselaer county.

The facts sufficiently appear in the opinion of the court of appeals, and also in the opinion of the general term, reported at 7 *N. Y. Crim. Rep.* 481.

*Lewis E. Griffith and John P. Kelly* (district attorney), for the people respondent.

*Orin Gamble and J. K. Long*, for defendant appellant.

FINCH, J.—The defendant was convicted of manslaughter in the first degree, but the general term has reversed that conviction for alleged error in the charge to the jury; and from that reversal the people have appealed to this court, insisting that the charge, fairly construed, was correct, and violated no established legal rule. The prosecution proved the *corpus delicti*, the death of Logan, and the violence which caused it, by direct evidence which was in no respect disputed. His dead body was found upon the premises of the prisoner shot through the heart. The bullet had penetrated his clothing and entered his breast in a manner indicating that he was facing his antagonist when the shot

was fired.   The absence from the clothing of the deceased of anything like scorch or stain of powder was claimed to indicate that the weapon when fired was not in contact with his person, but at some distance from him, greater or less. The bullet was taken from the body.   A pistol was found in the prisoner's room, under his bureau, having 10 chambers, the central one carrying a bullet of 32 calibre, and the nine surrounding it of 22.   A discharged shell was found in the central chamber, which the bullet taken from the body of the deceased fitted, while the 9 smaller cartridges remained undischarged.   On the day of the homicide, at about midnight, the prisoner aroused a neighbor named Morey, and Dr. Harvie, saying to each that he had shot his best friend, or was afraid he had shot his best friend, but giving no explanation of the circumstances; and they, going with him to the house, found Logan lying dead near the entrance to the summer kitchen.   The prisoner was pale and nervous, and on finding Logan dead was taken with a fit of vomiting, but made no effort to escape, and quietly surrendered himself to the officers who were summoned and took him into custody.   He was entirely sober, and there was no evidence of intoxication.   His previous relations with Logan, who was a married man, were those of intimate friendship without anything to mar or disturb it.   That was the case made by the prosecution, and it presented to the jury a problem with very slight material for its solution.   That Logan met his death from a pistol discharged in the hands of Downs was sufficiently proved, but whether the shot was fired intentionally or accidentally, and, if intentionally, for what reason, did not appear.   The evidence disclosed no possible motive for an intentional homicide, and left the character and grade of the crime, if one had been committed, an unexplained mystery.   One circumstance, however, would be sure to attract the attention of an intelligent jury.   They would ask how Logan came to be at the rear of the house, near the entrance to its living rooms, at midnight; and what he was doing there

when he should have been at home with his wife and children. The saloon was in the front part of the house opening on to the street. It was closed for the night, and there had been no brawl or quarrel or disturbance there during the evening. The presence of Logan in the rear of the house, at or near midnight, and the absence of any previous quarrel or difficulty, would make it reasonably certain that something due to his presence, and sufficiently grave and serious to account for an intentional or accidental homicide, had actually occurred. What that was we have no means of knowing, except through the explanation given by Downs and his wife. He testifies, in brief, that he was aroused by the noise of a scuffle in the back kitchen; that he seized the pistol, which lay upon a stand near his bed, and rushed out; that he found Logan and Mrs. Downs on the floor in the act of adultery or rape, according as the woman was consenting or resisting; that he seized Logan, who at once attacked him, and in the struggle the pistol went off; and that this was after the woman had left the room, and, as she says, while she was at the front door going out for help or escape. She testifies that Logan seized her and threw her down, but does not say whether with her consent, or why she made no outcry. Of course this explanation was open to the criticism of the prosecution and the consideration of the jury. The principal fact sworn to has a strong probability in its favor. It accounts for the presence of Logan, at midnight, on the premises where he had no right to be, and furnishes the needed motive and explanation of the homicide which occurred. Without it we cannot understand the event; with it we can easily see how it did occur, or how it might have happened. It supplies both motive and occasion. But granting so much, the rest does not necessarily follow, and it was still for the jury to say whether the shooting was accidental or intentional, whether justifiable or excusable, whether with deliberate purpose, or in the heat of passion, and without intent to kill. It is obvious that in their consideration of these questions very much would depend on

the charge of the court as to the burden of proof and the
operation and extent of the rule relating to a reasonable
doubt. That such doubts might easily arise in many and
different directions is quite apparent from the facts to which
we have adverted. Take, for example, the prisoner's state-
ment that the pistol exploded in a fight between him and
Logan, and without his conscious act. If that be true,
while there was a homicide there was no crime ; for the
killing would become merely an accident or misadventure.
If, now, the burden is upon the prisoner to satisfy the jury
of that fact, and unless they are so satisfied they must deem
the homicide intentional, a verdict of guilty might easily
result. But if that burden is not upon the prisoner, if the
jury are told that it remains with the prosecution,—that if
the evidence leaves in their minds a reasonable doubt whether
the killing may not have been an accident or misadventure,
the prisoner must have the benefit of the doubt, because it
goes directly to the vital elements of the people's case, and
leaves it uncertain whether a crime has been committed at
all,—the verdict of the jury might be entirely different. A
similar result might attend a defence of justifiable homicide,
and so the question of the burden of proof and the scope
and effect of a reasonable doubt, became in the case at bar of
very great importance. We have decided so recently as to
make further citation needless, that the rule that in criminal
cases the defendant is entitled to the benefit of a reasonable
doubt applies not only to the case as made by the prosecu-
tion, but to any defence interposed (People *v.* Riordan,
117 *N. Y.* 71, 26 *St. Rep.* 531), and we had earlier held
under the statute defining the different classes of homicide
that whether it was murder or manslaughter in one of the
degrees, or justifiable or excusable, and so no crime at all,
depended upon the intention and circumstances of its perpe-
tration, and therefore mere proof of the killing raised no
legal implication of the crime of murder (Stokes *v.* People,
53 *N. Y.* 177). I think the charge in this case ran counter
to these rules, and was calculated to impress upon the jury a

conviction that proof of the homicide carried with it a legal implication of crime which shifted the burden of proof upon the prisoner, and required him to satisfy the jury that the killing was either justifiable or excusable, at the peril of a conviction if he should fail in his attempt.

The learned trial judge began his charge with the definitions of the statute, and very fairly and correctly explained its classification of the different forms of homicide. Having done so he approached the rules which should govern the jury in deciding between them, and in so doing used expressions to which exceptions were taken. He said: "Now it is for you to say to which one of these clases of crime this evidence points. Here has been a homicide. Here has been a human life taken. It becomes a serious question as to whether or not a man shall execute the law or execute vengence upon his fellow. If he does he must do it at the peril of either being punished for it or being able to excuse himself when called upon to answer to the wrong within one of the excuses that is fixed and given in the law. If he is not he must be found guilty of one or the other of the crimes which are imputed to him by reason of the homicide." A jury could hardly fail to understand from this language that a homicide, the fact of a human lifetaken, involved a legal implication of murder which must compel a verdict of guilty unless the prisoner is able to excuse himself within the statutory definitions. If there was room to doubt about the meaning it became plainer from what followed. The learned judge added: "If you reach the conclusion that he was justified in taking the life of this man within the definitions given in the books, not within any notions of your own, but within the definitions given in the law, if you reach the conclusion that he was justified, then your verdict will be one of acquittal." Here the same idea is conveyed in another form. To acquit, the jury must "reach the conclusion" that a justification has been established. It is evident that the prisoner's counsel so understood the charge, and, after excepting to it, made a series of

requests with a view of more clearly ascertaining the mean-
ing of the charge, or procuring a modification of its terms.
He asked the court to charge "that no state of ·proof ever
changes the burden of proof; the burden remains through-
out the trial upon the people;" to which the learned judge
replied: "I decline to charge it in those words. I qualify
it by saying that if the people establish the homicide by
the use of a deadly weapon, committed by the defendant
intentionally and with deliberation, that then any excuse for
the commission of that crime or the commission of that act
must come from the defendant." The understanding of
the jury of the position of the court was quite likely to be
that the burden did not always rest on the prosecution; but
when a *prima facie* case of murder had been made the
burden shifted to the defendant, who sought to excuse or
justify. And this is in precise accord with the previous
charge that where a homicide was shown to have been
committed by the prisoner he must be convicted, unless he
is "able" to justify or excuse the act, and unless the jury
"reach the conclusion" that there is legal excuse or justifi-
cation. And then, to further test the attitude of the court,
the defendant's counsel asked for a charge "that there is no
legal implication from the fact of the shooting that the
defendant intended to take the life of Logan." That was
declined, and an exception taken.

Now, construing together what the court said, and what
it refused to say, I think it is obvious that the jury were
likely to act under the impression that a homicide proved
implied crime on the part of the slayer; that a conviction
must follow unless the prisoner justified or excused the act;
that the burden of that defence was upon him; and that to
secure acquittal he must be able to show a legal justification
or excuse, and the jury must reach that conclusion if it
would acquit. The learned district attorney, however,
insists that the court did charge that the guilt of the prisoner
must be established beyond a reasonable doubt, and refers to
several passages in which that was said. A reference to

them indicates that none of them related to the defence of justification or excuse, nor did they indicate that a reasonable doubt would operate in the prisoner's favor beyond the case made by the prosecution. Thus, in describing the character of the proof requisite to establish the *corpus delicti* as distinguished from the guilt of the prisoner, the court said the former must be proved by direct evidence, and the latter beyond a reasonable doubt. In describing the killing of Logan, the court said: "I do not know that it is controverted on either side that he came to his death by a bullet, a pistol shot, as almost conceded; but you are to find that fact. If there is any doubt about it, of course the defendant has the benefit of the doubt." Upon request of the prisoner's counsel, the court also charged "that it is incumbent upon the people to prove affirmatively beyond a reasonable doubt what grade of crime, if any, was committed;" and also upon the like request, "that if upon the whole evidence of the people and the defendant taken together there is a reasonable doubt in the minds of the jury as to whether or not the defendant discharged the pistol at Logan with intent to kill him, they must acquit the defendant of the crime of murder in both degrees." I am unable to see that these expressions at all modify or control what was said and refused to be charged as to the burden of proof, and the manner in which justification or excuse should be proved. They fall very far short of a cure for the error which was committed. Taking the charge together, and construing it as a whole, I am unable to resist the conviction that in the minds of the jury it shifted the burden of proving his defence upon the prisoner, and deprived him as to that defence of the benefit of a reasonable doubt. While there is no legal implication of the crime of murder from the bare fact of a homicide, the jury may infer it as a fact, and may do so even though no motive is assigned for the act, and the case is bare of circumstances of explanation (People *v.* Conroy, 97 *N. Y.* 77). But the inference is one of fact which the jury must draw if such seems to them to be their

duty, and not one of law which the court may impose upon their deliberation, and then upon that assumption shift the burden upon the prisoner and require him to prove that no crime has in fact been committed. We think, therefore, that the order of the general term, reversing the judgment of conviction, was right, and should be affirmed.

All concur, except RUGER, C.J., not voting.