Felix RAMIREZ, Petitioner-Appellee,

v.

E. W. JONES, Superintendent, Respondent-Appellant.

No. 966, Docket 81–2431.

United States Court of Appeals, Second Circuit.

Argued April 6, 1982.

Decided June 30, 1982.

---

Judith L. Turnock, New York City (William E. Hellerstein, Legal Aid Society, New York City, of counsel), for petitioner-appellee.

Susan L. Yarbrough, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen. for the State of N. Y., Gerald J. Ryan, Asst. Atty. Gen., New York City, of counsel), for respondent-appellant.

Before KEARSE and PIERCE, Circuit Judges, and LEVAL,* District Judge.

PIERCE, Circuit Judge:

On November 11, 1976, appellee Ramirez was involved in an altercation with one Estaban ("Smokey") Casilla during which appellee stabbed Casilla, who later died from the wound. Appellee was indicted for murder in the second degree and tried before Justice Ivan Warner and a jury in New York State Supreme Court, Bronx County. At trial appellee admitted stabbing Casilla, but contended that he had acted in self-defense. On May 4, 1978, appellee was convicted of manslaughter in the first degree. He was subsequently sentenced to imprisonment for an indeterminate term of five to fifteen years.

On July 17, 1980, appellee's conviction was affirmed by the Appellate Division, First Department, in a lengthy opinion from which two justices dissented. *People v. Ramirez*, 76 A.D.2d 115, 430 N.Y.S.2d 83 (1st Dep't 1980). Appellee's application for leave to appeal to the New York Court of Appeals was denied on August 21, 1980. Appellee then filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in the United States District Court for the Southern District of New York, 530 F.Supp. 345. Appellee contended therein that by charging the jury, *inter alia*, that "[a] person is presumed to intend the natural and probable consequences of his acts," the state court improperly shifted the burden of proof on the issue of intent to the defendant in violation of *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). On November 16, 1981, the district judge granted appellee's petition and ordered that he be released unless retried within sixty days. The State appealed, and on December 22, 1981, Judge Motley granted a stay of her order pending this Court's decision of the appeal. We now affirm.

The circumstances under which Casilla was stabbed on November 11, 1976, were hotly contested at appellee's trial. According to the People's evidence, the incident which resulted in Casilla's death began outside a social club when he and appellee became embroiled in a heated árgument over a woman. Casilla then suggested to appellee that the two of them should "fight like a man, one on one." (Tr. 112). Prosecution witnesses testified that, in preparation for the fight, Casilla took off his jacket and turned to give it to one of his friends to hold. They stated that while Casilla was thus turned away, appellee pulled out a knife and stabbed Casilla in the chest. A melee ensued during which appellee was hit on the shoulder with a cane and/or a crowbar or police lock bar, and appellee moved toward Casilla's associates, who remained nearby, brandishing his knife. Finally, two police officers arrived at the scene and arrested appellee.

Appellee testified in his own defense and presented a different view of the events

* Hon. Pierre N. Leval, United States District Judge for the Southern District of New York, sitting by designation.

which occurred before and after the stabbing of Casilla. He testified that approximately two weeks prior to the incident on November 11, 1976, Casilla and two other men accosted appellee on the street, beat him, and robbed him of his money, wristwatch, a medal and a ring which he wore on a chain around his neck.[1] He testified further that on November 11, 1976, while walking outside the social club, he was surrounded by five men. Casilla was carrying a police lock bar; the others had sticks and canes.[2] When the men had surrounded him, Casilla stated that they were going to "do to me the same thing they had done the first time." (Tr. 302). According to appellee, Casilla then swung at him with the police lock bar. Appellee ducked and then pulled out a knife and stabbed Casilla.[3] Appellee testified that his intent at that time was to defend himself. He testified, "I got scared. I got nervous because they all surrounded me and that's when—I squeezed the knife that I had but not with the intention of killing him but of defending myself." (Tr. 322). After the stabbing, appellee brandished the knife at the four men who still surrounded him and who he thought were going to jump him and beat him with their sticks. The police then arrived and arrested appellee.

In addition to the above, Assistant District Attorney Knauer, who interviewed the appellee at the police station after his arrest, and testified for the prosecution at the trial, stated that appellee admitted to him, at the station house, that after the hold-up on October 30, he (Ramirez) told Casilla that he would "get even" with him. In his summation to the jury, appellee's counsel argued, in light of Assistant District Attorney Knauer's testimony, that, even if, on October 30, when Casilla allegedly beat and robbed appellee, appellee did in fact threaten to "get even" with Casilla, "all that meant was he would do the same thing that happened to him, that was done to him by Smokey and the two other men. What was that [?] [B]eing robbed and being assaulted. Certainly there is nothing there to indicate any intent to kill . . . ." (Tr. 471). It is clear, therefore, that appellee sought to convince the jury that when he stabbed Casilla he lacked any intent to kill him.[4]

*The Sandstrom Violations*

The trial judge charged the jury extensively with reference to the question of intent. He stated as follows:

"Let me now define this word intent for you.

*A person is presumed to intend the natural and probable consequences of his acts.* Criminal intent is an intent to do knowingly and willfully that which is condemned as wrong by law. A criminal intent may be inferred from all the circumstances of the case. It need not be established by direct proof to constitute the crime. There must not only be the act, but also the criminal intent and these must occur. The latter being equally essential with the former. The existence of criminal intent constitutes a question of fact for the determination by you. The burden of showing intent, the intent with which a crime has been committed, rests upon the Prosecution to establish by evidence beyond a reasonable doubt. So where the law requires that the People must establish a specific or certain intent on the part of the one charged with the commission of the crime, the law does not expect or require for obvious reasons that intent must be proved by direct proof to

---

1. Appellee testified that at the time of this robbery (October 30, 1976), he did not know any of the three men who attacked him. However, when he saw Casilla on November 11, he recognized him as one of the three men.

2. Both of Casilla's associates who testified at appellee's trial admitted that they, Casilla, and the others present when Casilla was stabbed, were members of a gang called the Savage Nomads.

3. Appellee testified that he had a kitchen knife with him because he had just finished using it to clean the battery in this brother's car.

4. Appellee's trial counsel did request that the court charge manslaughter in the second degree and assault as lesser included offenses. The court declined to do so.

an absolute certainty or with mathematical precision. Intent, and I mean criminal intent, is always an essential element to the commission of a crime such as we have here. It may be proved by direct evidence or it may be proved from circumstances surrounding the transaction or act itself, or it may be proved by a combination of both.

Well, what is intent? Intent is the frame of mind of the perpetrator of the act at the time it is committed. You must probe the mind. You may say to yourselves, well, how are we to determine what a person's intentions are? Well, ladies and gentlemen, we can only determine that by one's acts, by one's conduct, by what was done and what was said, if anything. You should consider what was allegedly done; what means were allegedly employed; the type of instrument allegedly used, if any; the part of the body allegedly attacked; and all these circumstances, and from these surrounding circumstances, you then are to determine the intention of the perpetrator at the time.

*Under our law, every person is presumed to intend the natural and inevitable consequences of his own acts.* The jury has the right to infer from the results produced, the intention to effect such result. The intent formed is a secret and silent operation of the mind, and it's [sic] physical manifestation[,] *[t]he accomplishment of the thing determined upon[.] [O]ne's mind is compelled from necessity to refer to the acts and physical manifestations of the intent exhibited by the results produced is the safest, if not the only [,] proof of the fact to be ascertained.* A person acts intentionally with respect to a result or to conduct described by Statute defining an offense when his conscious objective is to cause

such result or to engage in such conduct." (emphasis added).

It is clear to this Court, as the district judge found, that the italicized portions of this charge shifted the burden of proof as to the intent issue to the appellee.[5] In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that such a shifting of the burden as to an essential element of the crime charged was unconstitutional in light of its earlier holding in *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that a defendant may not be convicted of a crime unless the prosecution meets the burden of proving beyond a reasonable doubt every element of the crime charged.

On appeal the State argues that the challenged portions of the charge given by the state court judge herein must be reviewed in the context of the entire charge, and that when viewed in that light any error was harmless. While the State's premise is correct, *see Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973); *Nelson v. Scully*, 672 F.2d 266 (2d Cir. 1982); *Mancuso v. Harris*, 677 F.2d 206 (2d Cir. 1982), we do not agree with its conclusion.

As stated in *Cupp, supra*, "the question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." 414 U.S. at 147, 94 S.Ct. at 400. In *Nelson, supra*, this Court took heed of this warning and carefully analyzed the *Sandstrom*-type language in the context of the entire charge given. After making this examination, we concluded that "taking the entire charge into consideration, there was [no] significant possibility that harm was done." *Nelson, supra*, 672 F.2d at 272.

---

**5.** Appellee's trial counsel did not object to the trial court's charge on the issue of intent. Nevertheless, the Appellate Division did reach the merits of appellee's claim. Since the Appellate Division thus chose to ignore the New York State contemporaneous objection rule, "we see no warrant ... for guarding state procedural rules more vigilantly than the State

itself does." *Washington v. Harris*, 650 F.2d 447, 452 (2d Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982). *See also Engle v. Isaac*, —— U.S. ——, 102 S.Ct. 1558, 1575 n.44, 71 L.Ed.2d 783 (1982); *Castaneda v. Partida*, 430 U.S. 482, 485 n.4, 97 S.Ct. 1272, 1275 n.4, 51 L.Ed.2d 498 (1977).

In *Mancuso, supra*, at 210, this Court undertook a similar analysis of the language said to be violative of *Sandstrom*, and, after reviewing it in the context of the entire charge given by the state trial judge, rejected the contention that the inclusion of that language had violated the petitioner's constitutional rights. In addition, the Court found it significant that, in that case, the defendant had not specifically placed the question of his intent in issue, but had attempted instead to disassociate himself entirely from any involvement in the crime charged. *Id.* at 211. *See also United States v. Reeves*, 594 F.2d 536, 541 (6th Cir.), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979).

In this case, however, appellee admitted that he stabbed Casilla. Thus the essential issue to be decided by the jury was whether appellee possessed the intent necessary to support a conviction for either murder in the second degree or manslaughter in the first degree.[6]

In this regard we do not agree with the argument that by asserting the defense of self-defense the appellee conceded his intent to kill Casilla. At trial appellee stated that he had acted in self-defense, that he was afraid for his life, and that he had no intent to kill. In this context, appellee's intent to defend himself is consistent with either (a) an intent to kill, (b) an intent to injure seriously, or (c) an intent to injure slightly. *See Mason v. Balkcom*, 669 F.2d 222, 227 (5th Cir. 1982). Thus, it cannot be said that the theory of defense in this case contributes to a finding that the offending portions of the charge to the jury created "[no] significant possibility that harm was done." *Nelson, supra*, 672 F.2d at 272; *Mancuso, supra*, at 211.

An analysis of the charge given in the state court leads us to the same conclusion. The trial judge twice charged the mandatory presumption that "a person is presumed to intend the natural and probable consequences of his acts," which was found to be constitutionally defective on the facts in *Sandstrom, supra*. In addition, toward the end of the charge as to intent, the judge greatly exacerbated its problematic character by stating that "the acts and physical manifestations of the intent exhibited by the results produced is the safest, if not the only proof of the fact to be ascertained." Although the charge did also contain some instructive language which may have tended to be curative, we cannot say that, reading the charge as a whole, "there was [no] significant possibility that harm was done." *Nelson, supra*, 672 F.2d at 272. The fact that the court gave instructions as to the requirement that the prosecution must carry the burden of proof and as to the reasonable doubt standard of proof does not cure the *Sandstrom* error present here since a reasonable juror could well have concluded that the presumption as to intent constituted a method of satisfying the prosecutor's burden. *Sandstrom, supra*, 442 U.S. at 519 n.7, 99 S.Ct. at 2456 n.7.

To refuse to grant the petition for a writ of habeas corpus in this case, where the violation was significant, and where intent was *the* crucial issue to be decided by the jury, would be wholly unwarranted in light of the holding of *Sandstrom*.

*Retroactivity*

Appellee was convicted in the state court on May 4, 1978. The Supreme Court rendered its decision in *Sandstrom, supra*, on June 18, 1979. On this appeal the State

---

**6.** New York Penal Law § 125.25 defines murder in the second degree, in pertinent part, as follows:

"A person is guilty of murder in the second degree when:
1. With intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

New York Penal Law § 125.20 defines manslaughter in the first degree, in pertinent part, as follows:

"A person is guilty of manslaughter in the first degree when:
1. With intent to cause serious physical injury to another person, he causes the death of such person or of a third person; or
2. With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance . . . ."

argues that *Sandstrom* should not be "retroactively" applied to invalidate convictions entered before the Supreme Court announced its decision in that case. However, even prior to the Supreme Court's decision in *Sandstrom, supra,* use of the language proscribed therein by a New York court was unwarranted in light of the law of both the State of New York and of this Circuit. In *People v. Thomas,* 50 N.Y.2d 467, 429 N.Y.S.2d 584, 407 N.E.2d 430 (1980), the New York Court of Appeals stated that "*Sandstrom* did not alter the law of this State. For more than a century, the charge condemned in *Sandstrom* has been held by this court, to be erroneous as a matter of State law (*Stokes v. People,* 53 N.Y. 164, 179 [(1873)]; *People v. Baker,* 96 N.Y. 340, 350 [(1884)]; *People v. Downs,* 123 N.Y. 558, 564–568, 25 N.E. 988 [(1890)]; *People v. Flack,* 125 N.Y. 324, 335, 26 N.E. 267 [(1891)]; *People v. Weiss,* 290 N.Y. 160, 171, 48 N.E.2d 306 [(1943)])." 50 N.Y.2d at 472–73, 429 N.Y.S.2d at 587, 407 N.E.2d at 433. *See also United States v. Robinson,* 545 F.2d 301, 305–06 (2d Cir. 1976) ("the 'natural and probable consequences' charge . . . is a burden-shifting charge which has the potential for misleading the jury with respect to the requirement that the government must prove every element of an offense beyond a reasonable doubt." 545 F.2d at 306); *United States v. Bertolotti,* 529 F.2d 149, 159 (2d Cir. 1975); *People v. Getch,* 50 N.Y.2d 456, 464 n.2, 429 N.Y.S.2d 579, 583 n.2, 407 N.E.2d 425, 429 n.2 (1980).[7]

We find, therefore, given the full context of this case, that the state judge's charge to the jury violated the constitutional rights of the appellee. Consequently, the decision of the court below granting the writ is affirmed. The mandate shall issue forthwith, and appellee must be released by the State unless he is retried within ninety days from the date the mandate issues herein.

7. In *People v. Getch, supra,* 50 N.Y.2d at 464, 429 N.Y.S.2d at 583, 407 N.E.2d at 429, the New York Court of Appeals held, on federal constitutional grounds, that the Supreme Court's holding in *Sandstrom* was applicable to all cases still in the New York appellate process as of the date of that decision (June 5, 1980).

LEVAL, District Judge, Sitting by Designation, concurring:

I concur, but add a few words on the significance of petitioner's failure to object at trial. As Judge Pierce notes, *see supra* note 5, the failure to object at trial should not be treated as a procedural bar to our consideration of the merits if it was not so treated by State appellate court. We should indeed not guard a state procedural rule more vigilantly than the state does. *See Washington v. Harris,* 650 F.2d 447, 452 (2d Cir. 1981).

This proposition means only that the door to the federal court will not be closed. It does not mean that the failure to object disappears from consideration. Upon the federal court's examination of the question whether the state conviction violated petitioner's constitutional rights, the failure to object remains a factor to be accorded whatever significance and weight it deserves.

A failure to object contemporaneously can be significant in a number of ways, apart from triggering a state law procedural bar. It is a part of the context of the alleged error. It can serve as a practical indication of the small importance of the incident, as appraised by trial counsel. It may result from a conscious choice by counsel to preserve the benefit of the error for appeal or collateral attack, rather than have it cured by bringing it to the trial judge's attention. It can raise questions of fairness to the People. In the practical context of a trial, furthermore, it can even occur through a prior understanding between counsel and the trial judge that is not reflected on the record. (For example, counsel for defendants who do not testify often ask the trial judge to omit the standard draw-no-inference charge.)

As noted previously, appellee Ramirez's conviction was not affirmed by the Appellate Division until July 17, 1980. In reaching its decision the Appellate Division addressed appellee's *Sandstrom* claim, and rejected it, on the merits. 76 A.D.2d 115, 430 N.Y.S.2d 83 (1st Dep't 1980).

A state appellate court's consideration of the merits does not necessarily imply a finding that the failure to object should carry no adverse consequence for the defendant. By hypothesis, the cases we consider on *habeas* are those in which the state appellate court has ruled against the defendant. In this case, it can be confidently inferred from the opinion of the Appellate Division that its reason for reaching the merits was the importance of giving guidance to the lower courts on a question rendered controversial by the Supreme Court's recent decision in *Sandstrom*. There was no appraisal nor even mention in the majority opinion of the failure to object. Since the court ruled against petitioner on the merits, reference to his failure to object was unnecessary. The fact that the ruling was made on the merits carries no logical inference that the court rejected procedural considerations or found them to be without significance.

When the federal court considers the issue on *habeas* and rejects the state court's analysis of the constitutional issue, it must then give whatever consideration is appropriate to the procedural context in determining whether the error committed calls for granting the writ and vacating the conviction. It would be anomalous if a federal appeals court considering functionally identical trial records, one on appeal from the district court and one on *habeas* from the state court, would affirm the federal conviction on a harmless finding, but vacate the state conviction over which federal review power is far more limited.

Because the charge in this case contained errors far more potent than the erroneous, but relatively bland, *Sandstrom* transgression, and because the faulty language bore directly on petitioner's intent—the central issue in the case, petitioner's failure to object does not alter the conclusion that he is entitled to a new trial.