George CLARK, Plaintiff,

v.

Philip COOMBE, Superintendent of Eastern Correctional Facility, Respondent.

No. 82 Civ. 0170.

United States District Court, S. D. New York.

Aug. 11, 1982.

---

**800**

George Clark, pro se.

Robert Abrams, Atty. Gen. of the State of N. Y., New York City, for respondent; Daphne A. Fuller, Deputy Asst. Atty. Gen., New York City, of counsel.

1. 78 A.D.2d 778, 432 N.Y.S.2d 975 (1980).

2. Lee was not apprehended up to the time of petitioner's trial. However, petitioner there referred to the other person as Stephen Lee.

OPINION

EDWARD WEINFELD, District Judge.

George Clark, petitioner, now serving a sentence of 10 to 20 years, consecutively to any time due on a prior conviction, imposed following his conviction upon a jury verdict for robbery in the first degree entered in the Supreme Court, Bronx County, New York, seeks his release upon a federal writ of habeas corpus pursuant to 28 U.S.C., section 2254. He charges that the judgment of conviction is void for violation of his federal constitutional right to due process of law in that (1) the judge by charging the jury that petitioner was presumed to intend the natural and probable consequences of his acts shifted to petitioner the burden of proof of intent, an essential element of the crime charged; (2) the judge unfairly and erroneously marshalled the evidence; and (3) prosecutorial misconduct was committed outside the record. The judgment of conviction was unanimously affirmed upon appeal to the Appellate Division, Second Department [1] and leave to appeal to the Court of Appeals was denied. Thereafter, with respect to his claim of prosecutorial misconduct, petitioner applied to the trial court for relief under New York State's Criminal Procedure Law which was denied. Leave to appeal to the Appellate Division was also denied.

Clark was indicted and convicted of robbery in the first degree for acting in concert with another in robbing Ellis Saffan of his property at his laundromat during the course of which the robber displayed a pistol. In substance, the People's proof established that at about 7:00 p. m. on February 8, 1978, petitioner and the other person, Lee,[2] entered the laundromat and while Saffan was working in the back room fixing machine parts Lee entered and waved an automatic pistol in his face stating, "This is the real thing";[3] that he then shoved Saffan against the rear wall and

3. Trial Record at 52 (hereinafter "T.R.")

putting the gun to his head seized and took Saffan's keys and wallet with all its contents.

The robbery lasted about five minutes. In the initial stage, petitioner was in a brightly lit area where James Cobbs, an employee of the laundromat, was working. Cobbs saw petitioner walk from that area to the partially opened back door and open it. Saffan testified that the petitioner then yelled to Lee, "Hurry up. Let's get out of here."[4] Cobbs who had followed the petitioner to the back room was stopped by petitioner who said that Saffan and the other fellow (Lee) were "talking business."[5]

Cobbs left the laundromat and telephoned the police from a nearby store. As he was returning to the laundromat, he saw petitioner and the other man (Lee) about 20 feet from the laundromat crossing the street. One of them told him to "mind [your] business";[6] in the laundromat, he found Saffan locked in the back room and released him. Both men then hurried to the street. As Saffan started to walk toward petitioner, he and Lee started to run away. Saffan then unsuccessfully searched the area for his wallet and keys. Upon the arrival of a patrol car, Saffan described the two men to the police officers, then closed the store and went to his home. At home, Saffan received a telephone call during which the caller inquired whether he had notified the police. Saffan told his then unknown caller that he had only notified credit card companies to cancel his cards. The caller then said, "We want to return your property. Sorry for what happened. I am going to do you a favor. I want to give you back your things. I know you need them and everything else. How about making me an offer?"[7]

Saffan said he didn't know what to offer since they took everything; that the only items he needed were his keys, license and registration. Thereupon the caller said he would telephone again after talking to his friend. A half hour later the man called back, and after inquiring whether Saffan had been in touch with the police and upon Saffan's denial that he had, the caller said he wanted $50. Saffan offered $25, which the caller rejected saying, "You got to do better than that."[8] The caller then said he would get in touch with Saffan again after talking to his friend. Soon Saffan received a third call from the same person; they settled for a $35 payment and some discussion ensued as to a meeting place to conclude their transaction. Again, the caller said he had to talk to somebody and it was finally arranged that Saffan was to make the payment at a designated doughnut shop.

Saffan entered the shop and seated himself nearby under the observation of a detective. The petitioner soon entered and seated himself at the counter. He then approached Saffan who recognized him as one of the two men in the laundromat—the one who spoke to the holdup man. Petitioner said, ". . . I got your stuff here . . . and your wallet is in the bag."[9] Saffan examined the contents and was satisfied everything was there except the money and the keys; petitioner said he would return the keys first thing in the morning. Upon a prearranged signal, the detective arrested petitioner. The recovered wallet contained Saffan's driver's license and registration, two Visa cards, bank identification cards, a Bond's credit card and a VA hospital card.

Clark testified in his own behalf. His version of events was that he had washed his work clothes at a girlfriend's apartment near the laundromat; that on his way there to dry his clothes, which were in a shopping bag, he stopped off at a grocery store next door to the laundromat to get change. There by chance he met Stephen Lee with whom, on occasion, he had played basketball. They entered the laundromat and pe-

4. T.R. at 26.

5. T.R. at 28.

6. T.R. at 30.

7. T.R. at 64.

8. T.R. at 64.

9. T.R. at 68.

titioner further testified that he placed the shopping bag containing his clothes in the front area of the store, removed the clothes and placed them in a dryer in the rear which he engaged. He then returned to the front where he picked up the empty shopping bag to put it on a folding table. Up to that time, he had not seen where Lee had gone but then happened to look in the back room, the door of which was partially open and, in petitioner's own words, "just stuck my head in the first time and I happened to see complainant upon the wall with his hands on the wall."[10] He pulled his head back out and was about to go to the dryer in which he had placed his clothes when he bumped into Cobbs, who asked him what he was doing back there. Because petitioner had "seen what was happening in the back [he] told him [Cobbs] to mind his business and . . . walked past him to get my clothes out of the dryer, put in the bag."[11] Petitioner continued his testimony that on his way out he went back again and "this time Mr. Lee was closer to [Saffan]; this time with his gun to his head, and I grabbed his wrist and . . . said you got what you came here for. Why don't you leave the man alone and get out of here?"[12] Petitioner further testified he then left the laundromat and while walking Lee ran up to him. They had a few words dealing with what happened at the laundromat; that Lee, after going through the wallet, threw most of the papers on the ground; that he picked some of them up and told Lee he would send them back to the man since one "has to go through a whole lot of trouble replacing them,"[13] and so he did pick up a number of items. Thereafter, he went to his girlfriend's apartment.

Later, he went to a pool room at 165th Street and Ogden Avenue where, about a half hour later, Lee walked in and they had a conversation about what happened at the laundromat. Lee asked petitioner what he intended to do with the papers he had picked up; petitioner replied that he had not yet decided. Lee then gave him the rest of the papers.

Petitioner further testified that he then telephoned Saffan and told him that he had come across his papers and would leave them at the grocery store next to the laundromat; that Saffan asked him to bring them to another place which he refused because he "didn't want to get involved with what happened";[14] that this conversation was interrupted because he was causing confusion among nearby pool players. Accordingly, he went to a nearby grocery store where he placed a second call to Saffan to complete the interrupted conversation. In that second call he told Saffan about his property and Saffan suggested they meet at a doughnut shop. They later met outside the doughnut shop where petitioner handed over the papers. Saffan then walked into the doughnut shop followed by petitioner, who, after seating himself at the counter, was arrested by the police.

Petitioner denied that while in the laundromat he was trying to help Lee rob Saffan or that he asked or received money from Lee. He also denied that he asked Saffan for $50, or that Saffan offered him money for the return of his papers. He testified that in the laundromat he told Cobbs to mind his own business but denied repeating it outside in the street because he did not see Cobbs again. He denied that he told Saffan that he threw his keys away.

The foregoing summary of the evidence establishes that a rational juror could readily find that the People had established the essential elements of the crimes charged beyond a reasonable doubt.[15] However, petitioner contends, based upon the Supreme Court ruling in *Sandstrom v. Montana*,[16]

10. T.R. at 134.

11. T.R. at 154.

12. T.R. at 135.

13. T.R. at 136.

14. T.R. at 138.

15. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

16. 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

that the instruction to the jury that a person is presumed to intend the natural and probable consequences of his acts relieved the State of its burden of proof on the issue of intent and shifted it to the defendant, and thus was constitutionally defective and deprived him of due process of law. The State not only disputes his claim upon the merits but contends that the petition for federal writ of habeas corpus relief must be dismissed under New York's contemporaneous objection rule, since petitioner did not except to the instruction at the trial level on the ground now urged, and has failed to show cause and prejudice under *Wainwright v. Sykes*[17] and its most recent successor cases.[18]

■ The State's contention must be upheld. While it is true that an exception was taken to the court's charge on intent, this was cast in terms of an evidentiary error rather than one of constitutional violation. Counsel's exception was to the court's "definition of intent ... that it was not sufficiently done to explain the intent the defendant must have in order for him to be convicted of each and every one of the crimes charged in the indictment."[19] There was no suggestion that the objection was based on the ground that the instruction relieved the State of its burden of proof on the issue of intent or that the burden was shifted to the defendant. The purpose of an explicit exception or objection is to afford the trial court the opportunity to effectively correct any alleged errors at a time when they are correctable.[20] Accordingly, under New York law, an exception not explicitly raised at trial may not be considered the first time upon appeal.[21] There is a narrow exception to this general rule which applies in the instance of an alleged violation of a fundamental constitutional right.[22] However, the fact that this case was tried in October 1978, some eight months *before Sandstrom* was decided or that the issue was presented by petitioner upon appeal to the Appellate Division as a violation of federal and state constitutional rights *after Sandstrom* was decided,[23] does not save the day for petitioner. This was not an instance where failure to object at the trial level on federal constitutional grounds can be excused because the instruction had been deemed valid at the time of the trial and had only been called into question by an intervening Supreme Court decision. *Sandstrom* was not a new doctrine under New York law. As the State Court of Appeals observed:

> *Sandstrom* did not alter the law of this State. For more than a century, the charge condemned in *Sandstrom* has been held by this court, to be erroneous as a matter of State law. Thus the defendant's failure to object cannot be excused on the ground that he was confronted at trial with a practice held or deemed to be valid which was only called into question by a Supreme Court decision announced while the case was on appeal.[24]

Thus petitioner's claim for habeas corpus relief is not cognizable unless he establishes

**17.** 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

**18.** *Engle v. Issac*, —— U.S. ——, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *United States v. Frady*, —— U.S. ——, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

**19.** T.R., Charge at 59.

**20.** *People v. Robinson*, 36 N.Y.2d 224, 228, 326 N.E.2d 784, 786, 367 N.Y.S.2d 208, 211 (1975).

**21.** New York Crim.Proc.Law § 470.05(2) (McKinney 1971); *People v. Thomas*, 50 N.Y.2d 467, 471, 407 N.E.2d 430, 432, 429 N.Y.S.2d 584, 586 (1980).

**22.** *Id.* at 471–72, 407 N.E.2d at 432, 429 N.Y.S.2d at 586–87; *People v. Patterson*, 39 N.Y.2d 288, 347 N.E.2d 898, 383 N.Y.S.2d 573 (1976), *aff'd*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

**23.** Petitioner's brief is dated February 1980. *Sandstrom* was decided on June 5, 1979. The New York State Court of Appeals held, on federal constitutional grounds, that *Sandstrom* was applicable to all cases still in the appellate process as of the date it was decided. *People v. Getch*, 50 N.Y.2d 456, 462, 464, 407 N.E.2d 425, 428, 429 N.Y.S.2d 579, 583 (1980).

**24.** *People v. Thomas*, 50 N.Y.2d 467, 472–73, 407 N.E.2d 430, 433, 429 N.Y.S.2d 584, 587 (1980) (citations omitted).

"cause" for the procedural default and "prejudice" as mandated by *Wainwright*.[25] In the light of New York State's more than century old rejection of the instruction here at issue, it can hardly be argued that there was cause for noncompliance with the State's procedural rule. But even more important, and assuming that cause has been established, there is no showing of actual prejudice.

The basic question in constitutional terms is whether the complained-of instruction in its frame of reference with respect to the totality of the charge "so infected the entire trial that the resulting conviction violates due process."[26] The instruction here under attack must be considered not in isolation but in the context of the overall charge.[27] The court's charge which covers 58 pages of the stenographic transcript extensively instructed the jury on the presumption of innocence, the State's burden of proof to establish each essential element of each crime charged[28] beyond a reasonable doubt and that the defendant did not have to prove his innocence. A fair reading of the court's charge suggests, as Judge Friendly so aptly put it, that "[i]t would be hard to think of an instruction which expounded more fully the presumption of innocence and the right of a criminal defendant to have the state compelled to establish every element of the crime beyond a reasonable doubt."[29]

◼ We now turn to the allegedly tainted charge. The court had previously instructed the jury as to the State's burden of proof with respect to the essential elements of the specific crime charged therein and, in each instance, reiterated its earlier general instruction that the burden of proof was upon the People and if it failed to establish guilt beyond a reasonable doubt, the jury's duty was to acquit. The court then gave the challenged instruction:

Now, intent. The law is that a person is presumed to intend the natural, probable consequences of his acts. Criminal intent is an intent to do knowingly and willingly that which is condemned as wrong by the law. A criminal intent may be inferred from all the circumstances of the case. It need not be established by direct proof. To constitute the crime there must not only be the act but also the criminal intent and these must occur, the latter being equally essential to the former.

The existence of criminal intent constitutes a question of fact for the determination by you, and the burden of showing intent, the intent with which a crime has been committed, rests upon the prosecu-

---

**25.** The claim could also be passed upon here if it appeared that the State's Appellate Courts ignored the procedural default and had considered and decided the merits of the constitutional claim. *Taylor v. Harris*, 640 F.2d 1, 2 (2d Cir.), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981); *Gruttola v. Hammock*, 639 F.2d 922, 927 (2d Cir. 1981); *Brown v. Reid*, 493 F.Supp. 101, 102–03 (S.D.N.Y.1980); *People v. Thomas*, 50 N.Y.2d 467, 407 N.E.2d 430, 429 N.Y.S.2d 584 (1980). As already noted, petitioner did present his claim to the Appellate Division in terms of violation of his federal and state constitutional right to due process of law (Appellant's Brief at 19). The State argued that "defense counsel's subsequent generalized objection [at the trial] reveals that not only had appellant waived his right to raise this issue on appeal but that his substantive argument lacks merit." (Respondent's Brief at 12.) Since the Appellate Division affirmed without opinion and the Court of Appeals denied leave to appeal, it "strongly suggests that [the Appellate Division] regarded the procedural defect as controlling the out-come of petitioner's appeal, and that it did not take the extraordinary measure of exercising its discretion to review the claim on the merits." *Brown v. Reid*, 493 F.Supp. 101, 103 (S.D. N.Y.1980).

**26.** *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

**27.** *See, e.g., id.* at 146–47, 94 S.Ct. at 400–01.

**28.** The indictment, in addition to the first degree robbery count, included counts of robbery in the second degree, grand larceny in the third degree, criminal possession of stolen property and criminal possession of a weapon in the fourth degree. Since the jury found petitioner guilty of the first degree robbery count, under the court's instructions it returned no verdict as to the remaining counts.

**29.** *Nelson v. Scully*, 672 F.2d 266, 269 (2d Cir. 1982).

tion to establish it by evidence beyond a reasonable doubt.

So where the law requires that the People must establish a specific or certain intent on the part of one charged with the commission of a crime, the law does not expect or require, for obvious reasons that intent must be proved by direct proof to an absolute certainty or with mathematical precision.

Intent and I mean criminal intent is always an essential element to the commission of the crime such as we have here, and it may be proved by direct evidence or it may be proved by circumstances surrounding the transaction or the act itself or it may be proved by a combination of both.

What is intent? Intent is a frame of mind of the perpetrator of the act at the time he commits it. You must probe the mind. You must say to yourselves, how are we to determine what a man's intentions are? Members of the jury, we can only determine that by his acts, by his conduct, by what he does and what he says.

You should consider what he allegedly did, what means he allegedly employed, the type of instrument allegedly used, if any, the part of the body allegedly attacked, and all the circumstances. From these surrounding circumstances you are to determine the intention of the defendant at that time.

Under our law every person is presumed to intend the natural and the inevitable consequences of his own voluntary acts, and unless such acts were done under the circumstances which preclude existence of such intent, the jury has a right to infer from the results produced the intention to effect such result.[30]

This instruction, unlike that in *Sandstrom*, does not stand as an isolated and preemptory challenge. Here it was accompanied by qualifying language.[31] The court not only informed the jury that criminal intent was a fact issue for its further determination but again, as it had repeatedly done previously, it advised the jury and underscored that the burden of showing intent rested upon the prosecution to establish this element beyond a reasonable doubt; further, that the element could be established by direct and circumstantial evidence or a combination of both; finally, the jury was instructed to consider all the facts and circumstances in deciding the issue. Moreover, it is significant that under one count which permitted a statutory presumption with respect to stolen property, the court specifically admonished the jury that not only was the presumption rebuttable and that a defendant may offer evidence in an attempt to rebut or overcome the presumption, but emphasized that "no matter how persuasive the evidence or inference may seem, a defendant does not carry the burden of disputing it nor does his failure to offer evidence or rebut satisfy the prosecutor's burden. You jurors must decide whether to accept or reject the presumption after weighing all the credible evidence presented in the case."[32] Thus it was clearly brought home to the jury that a presumption was permissive and not conclusive and that it was for them to decide whether any inference was to be drawn upon a consideration of all the evidence.[33] Analysis of the alleged tainted instruction when read in its entirety and in its proper relationship to the charge leaves no room to doubt that the jury knew its choice was to decide the issue of intent, as well as all

---

**30.** T.R., Charge at 51–53.

**31.** *Mancuso v. Harris*, 677 F.2d 206, 210 (2d Cir. 1982) ("the qualifying 'unless' clause used here is virtually identical to that which this Court found to be both ameliorative and free of any improper burden-shifting effect in *Washington v. Harris*, 650 F.2d 447, 453 (2d Cir. 1981)"); *People v. Getch*, 50 N.Y.2d 456, 462, 465, 407 N.E.2d 425, 429, 429 N.Y.S.2d 579, 583 (1980) ("The court emphasized to the jury that

it should consider all the evidence, all the testimony, and all the circumstances surrounding the incident 'to determine if there was intent.' ")

**32.** T.R., Charge at 39.

**33.** *Cf. Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

other fact issues, on the entire evidence and that the burden of proof to establish the essential elements of the crimes charged beyond a reasonable doubt had not shifted to the defendant but, as reiterated throughout the charge, remained at all times upon the People.[34]

■ Petitioner next contends that the court unfairly and erroneously marshalled the evidence and thereby deprived him of a fundamentally fair trial. The claim raises no issue of constitutional proportions and upon the merits is without substance. The trial judge specifically informed the jury that he did not intend to marshal the evidence of each witness except to the extent necessary to refer to portions of various witnesses' testimony in explanation of the charge. He did, however, refer to the testimony of Cobbs, Saffan and petitioner. The petitioner's contention is that the judge misrepresented his testimony so as to make it appear that he knew about the robbery in advance. The court, in its summary of petitioner's testimony, stated,

> Lee accompanied him into the laundromat and went to the rear room. As Cobbs was about to go into the room, he stopped Cobbs telling him to mind his own business. He looked into the room and he saw Lee holding a gun to Saffan's head and going through his pockets. He told Lee that he got what he came for, why doesn't he go.[35]

This was at variance with petitioner's testimony on the subject. He testified it was only *after* he looked in the back room and saw Lee holding the gun to Saffan's head that he stopped Cobbs from entering. The petitioner's contention is by the court's account, he stopped Cobbs from entering the back room *before* petitioner himself had looked in and saw the robbery in progress.

The argument is so fine spun that to assure accuracy of petitioner's position, it is quoted here: "The inference to be drawn from the court's recitation is that, since appellant did not have to look to see the robbery, he must have known about the robbery in advance and therefore must have intended to aid in its commission when he stopped Cobbs from entering the back room." Whatever the logic or merit of this contention, the fact is the court made it clear that it did not undertake to summarize all the testimony and repeated several times that it was the jury's recollection of the facts that governed at all times. Moreover, the slight inaccuracy was submerged in the totality of references to the testimony, and clearly was not so egregious as to taint the fundamental fairness of the trial.

■ Petitioner's further claims require little discussion since they are not of constitutional dimension and, in any event, are without merit. First, he contends that he was deprived of his right to a fair trial because he was not permitted to testify upon his direct case when questioned as to whether he had discussed a robbery with Lee or knew that Lee had intended to commit a robbery. Upon the People's objection, his negative response was stricken. The ruling was made on the ground that the questions were leading; however, the court indicated that if proper questions were put, the proposed area of inquiry would be allowed. The evidentiary ruling did not foreclose the petitioner under appropriate questions from testifying on the issue of intent. In any event, he testified without restriction as to all matters that were pertinent and the jury had his full and detailed version and explanation of his acts, conduct and all the circumstances preceding, at the time of, and subsequent to the robbery.

34. The recently decided *Ramirez v. Jones*, 683 F.2d 712 (2d Cir. 1982), is distinguishable. There the court held that the charge was constitutionally tainted by the inclusion of the following: "[O]ne's mind is compelled from necessity to refer to the acts and physical manifestations of the intent exhibited by the results produced is the safest, if not the only[,] proof of the fact to be ascertained." At 715. The

Court held this portion of the charge "exacerbated" the issue and that a rationale juror could have concluded that the presumption as to intent constituted a method of satisfying the prosecution's burden of proof and thereby shifted the burden to the defendant.

35. T.R., Charge at 46–47.

Next, petitioner charges that the prosecutor's conduct deprived him of his right to a fair trial when the Assistant District Attorney stated during the voir dire that he intended to use trickery to prove petitioner's guilt. The petition does not contain a single evidentiary averment to support the charge. The trial minutes contain no such reference. The only matter offered on this application is an affidavit by petitioner submitted in support of a motion to the state trial judge (after the Appellate Division had affirmed the judgment of conviction) to vacate the judgment of conviction upon the ground that the alleged improper statement which occurred at the trial went unrecorded and if recorded would have required a reversal on appeal.[36] The affidavit states that during the voir dire the Assistant District Attorney in the presence of the trial judge, the panel of sworn jurors and petitioner's counsel told the court "that he intended to use trickery to prove guilt." In response to his inquiry, his appellate counsel wrote:

> As to the question of whether the district attorney told the jury during voire [sic] dire that he was going to use "trickery" to prove your guilt, I have been unable to either confirm or refute this. It seems to me, however, that if the district attorney actually said this, he would be prejudicing his own case in the eyes of the jury. It makes no sense for the district attorney to admit, up front, that he intended to use trickery; this would cast a shadow over his entire presentation.[37]

No affidavit by the trial attorney who obviously would have heard the alleged statement is submitted on this application nor is

any explanation offered for its nonproduction. These omissions weigh heavily against petitioner's factual contention.[38] In any event, the trial judge denied the motion since petitioner was in a position, but failed, to raise the issue both on a prior application to the trial court and on his appeal to the Appellate Division. This ruling, fully supported by the record below, requires rejection of the instant charge, as well as its lack of support on the instant petition.

Finally, even if it be assumed that any of petitioner's claims whether considered singly or collectively constituted constitutional error, the evidence of the petitioner's guilt was so overwhelming that the petition must be dismissed upon a finding that it was harmless beyond a reasonable doubt.[39] A close reading of the trial testimony, particularly petitioner's, establishes that the defendant's effort to place an innocent cast on his various statements and acts during and after the commission of the robbery borders on the absurd—indeed, his attempt to stamp his conduct as innocent qualifies as a Baron Munchausen tale. His happenstance meeting with Lee at the store next door to the laundromat, their entry thereafter into the laundromat and then his sudden discovery that Lee was engaged in a gun holdup in the rear, his entry into that area, his admitted statement to Cobbs to "mind his business," his preventing Cobbs from entering the back room, his second entry when Lee had Saffan back against the wall with the gun pointed at him and petitioner's grabbing Lee with the statement, "You got what you came for. Why don't you leave the man alone and get out of here," his discussion

---

**36.** N.Y.Crim.Proc.Law § 440.10 (McKinney 1971) provides:

At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that:

. . . . .

(f) Improper and prejudicial conduct not appearing in the record occurred during a trial resulting in the judgment which conduct, if it had appeared in the record, would have required a reversal of the judgment upon an appeal therefrom.

**37.** Letter of Bennett M. Lincoff, Esq. to George Clark (February 14, 1980).

**38.** *United States ex rel. Brooks v. McMann*, 408 F.2d 823, 826 (2d Cir. 1969), *vacated on other grounds*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *United States ex rel. Homchak v. New York*, 323 F.2d 449, 450 (2d Cir. 1963), *cert. denied*, 376 U.S. 919, 84 S.Ct. 677, 11 L.Ed.2d 615 (1964).

**39.** *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

with Lee after leaving the premises about what transpired at the laundromat, his recovery from the street of papers that were the product of the robbery and discarded by Lee, his second chance meeting with Lee at the pool room where the first and uncompleted telephone call was made to Saffan to negotiate the return of credit cards and other papers, his renewed and persistent negotiations to get payment for the keys and other items, his appearance at the doughnut shop where he had possession of and handed over the remaining fruits of the holdup, was so shallow that the jury understandably and readily rejected it.

The petition for a writ of habeas corpus is denied on the merits. So ordered.